[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Lemons*, Slip Opinion No. 2022-Ohio-3625.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-3625

DISCIPLINARY COUNSEL *v.* LEMONS.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Lemons*, Slip Opinion No. 2022-Ohio-3625.]

*Judges—Misconduct—Violations of the Code of Judicial Conduct—A judge's good intentions do not excuse him or her from complying with the Code of Judicial Conduct—Public reprimand.*

(No. 2022-0713—Submitted July 12, 2022—Decided October 13, 2022.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2021-040.

_____

**Per Curiam.**

{¶ 1} Respondent, Judge Richard Alan Lemons, of Portsmouth, Ohio, Attorney Registration No. 0030054, was admitted to the practice of law in Ohio in 1985. He has been a judge of the Scioto County Court of Common Pleas, Probate

and Juvenile Division, since February 2015. Lemons previously served as a magistrate in the same court from January 2011 to February 2015.

**{¶ 2}** In December 2021, relator, disciplinary counsel, charged Lemons with violating the Code of Judicial Conduct for independently investigating facts in a juvenile-court matter, failing to recuse himself from that case, and failing to perform the duties of judicial office fairly and impartially. Lemons stipulated to the charged misconduct, and the parties jointly recommended that he be publicly reprimanded. After a hearing, the Board of Professional Conduct issued a report finding that Lemons had engaged in the stipulated misconduct and agreeing with the parties' recommended sanction. Pursuant to Gov.Bar R. V(17)(B)(3), the parties filed a joint waiver of objections.

**{¶ 3}** Based on our review of the record, we adopt the board's finding of misconduct and agree that a public reprimand is the appropriate sanction in this case.

**Misconduct**

*Lemons's home visit*

**{¶ 4}** On Thursday, January 12, 2017, D.M., a father of five children, was arrested on a charge of corrupting a juvenile with drugs and held in the Scioto County Jail. At the time, D.M. had legal custody of his three oldest children while a relative had custody of his two youngest children; the children's mother was incarcerated. On the evening of D.M.'s arrest, a caseworker for the Scioto County Children Services Board ("SCCSB") visited the home where D.M. had resided with the three children and their grandfather. Later that evening, SCCSB put in place an in-home safety plan for the children—as an alternative to removing them.

**{¶ 5}** The following day, a school resource officer contacted Greg Dunham, one of Lemons's staff members, expressing concern for the well-being of D.M.'s children. Dunham and a probation officer visited D.M.'s home, which Dunham described as "filthy." According to Dunham, the water had been turned off, the

2

toilet was overflowing with human waste, the floor was littered with dog feces, the refrigerator was not working, and the children had no beds. Dunham reported his concerns to Lemons and to SCCSB, which sent a caseworker to D.M.'s home that evening to investigate Dunham's referral.

{¶ 6} SCCSB again decided not to remove the children from the home. After Dunham advised Lemons of SCCSB's decision, the judge talked to the caseworker on the telephone. According to Lemons, he asked the caseworker whether she would be comfortable leaving the children of SCCSB's director in the home and she responded, "Your Honor, I would not leave my dog there."

{¶ 7} The next day, Saturday, January 14, Lemons, accompanied by law-enforcement officers, conducted his own investigation of D.M.'s residence, during which Lemons confirmed the same conditions that Dunham had observed. Lemons also observed that the grandfather had a wall heater with an open flame that was within a few feet of his oxygen tanks; a cooler in the kitchen—which presumably was a substitute for the broken refrigerator—stored only dirty dishes; a child, who was not dressed appropriately for the cold weather, used the oven to warm himself; and the upstairs bedrooms, which were colder than the remainder of the house, had only mattresses on the floor—without box springs.

{¶ 8} After the home visit, Lemons returned to his chambers and issued an entry—"[u]pon the court's own motion" and without a case number—finding that two of D.M.'s children in the home were in imminent danger and ordering SCCSB to place the two children in its temporary custody and investigate the matter.[1] The judge also scheduled a hearing for three days later, on January 17. Court staff notified SCCSB of Lemons's emergency order, and SCCSB promptly removed the two children from D.M.'s home. Lemons did not send a copy of the emergency

---

1. The whereabouts of D.M.'s oldest child—who was 17 at the time—was not known, and Lemons did not refer to him in the January 14 emergency order.

order to D.M. or the children's mother, although the judge later acknowledged that the parents were statutorily required to be notified of his order.

**{¶ 9}** The court did not hold the scheduled hearing on January 17, because, according to Lemons, SCCSB had not yet completed its investigation. On Wednesday, January 18, SCCSB filed a new complaint alleging that all five of D.M.'s children were dependent because their parents were incarcerated and no other relatives could care for them.[2] SCCSB requested an ex parte order giving it custody of the children pending final adjudication and disposition. Lemons granted the ex parte order and presided over a January 19 probable-cause hearing.

**{¶ 10}** At the hearing, SCCSB did not present any evidence about the conditions of D.M.'s home and Lemons did not inform the parties—including the parents, who both appeared for the hearing, although they remained incarcerated— that he had visited D.M.'s residence. Lemons, however, mentioned the home's conditions during the hearing. For example, after D.M. asked whether his children would be placed with their grandmother, Lemons responded:

> Well, they're in custody right now, and this case will determine where they go. * * *
>
> We need homes, um, that they can go to, and the homes have to be CLEAN homes. They have to be homes where there are beds that aren't just mattresses laying on the floor that are stinking, filthy, dirty. They have to be, there has to be, plenty of food, not just enough where the kids can barely survive.
>
> Um, so in other words, I'm not going to put them back in a home similar to the home that they came from.

---

2. According to SCCSB's filing, the relative who had legal custody of D.M.'s two youngest children advised SCCSB that she could no longer care for them.

4

(Capitalization sic.) Lemons also said that if the grandmother's residence looked like D.M.'s home, "that's a NO" (capitalization sic) and that any possible home for the children would need to have running water and mattresses with box springs.

{¶ 11} Lemons continued presiding over the children's dependency proceedings, including the adjudication and dispositional hearings in April 2017. In 2019, Lemons granted SCCSB permanent custody of the two children who were the subject of Lemons's January 14, 2017 emergency order. However, at no time during the 2017 or 2019 proceedings did Lemons inform the parties or their counsel that he had personally inspected D.M.'s home and that his inspection was the basis for the January 14 emergency order, which essentially triggered the entire custody action.

*Lemons's explanation for his actions*

{¶ 12} During his disciplinary hearing, Lemons said that he had investigated D.M.'s home and issued the emergency order because he was upset with SCCSB for refusing to remove the children and wanted to "force [SCCSB] to do their job." Lemons explained that when he transitioned from magistrate to judge, Scioto County was the epicenter of the opioid epidemic and that as the problem worsened, "every parent[ ] seemed to be high and strung out." But SCCSB, Lemons claimed, was not investigating or filing enough cases. Because of SCCSB's inaction, the juvenile court was flooded with calls from grandparents, school representatives, and hospital employees asking the court to take some sort of action. The relationship between the juvenile court and SCCSB, Lemons said, became contentious, and when he visited D.M.'s home in January 2017, Lemons did not trust SCCSB's judgment.

{¶ 13} Lemons admitted, however, that he had allowed his frustration with SCCSB to get the better of him and that he should not have independently investigated the facts by personally inspecting D.M.'s home. Lemons also testified that due to several factors—including the fact that SCCSB has since disbanded—

the county children's-services agency that took its place is currently "taking care of [its] own business" and the juvenile court no longer receives as many desperate phone calls from schools or hospitals. The juvenile court, Lemons claims, now has a "great" relationship with the children's-services agency.

{¶ 14} Lemons also explained why he had initially believed that his recusal from the dependency cases was not necessary. SCCSB's complaint, the judge noted, alleged only that D.M.'s children were dependent because their parents were unavailable to care for them; SCCSB did not pursue the matter as a neglect case based on the conditions of D.M.'s home. Therefore, Lemons believed, the home's conditions were not relevant to the proceedings. But Lemons admitted that in hindsight, he should have recused himself because his impartiality might have been reasonably questioned due to his home visit. Lemons also agreed to recuse himself from any of the remaining dependency cases involving D.M.'s children.

*The board's findings of misconduct*

{¶ 15} The board concluded that Lemons violated three rules of the Code of Judicial Conduct. First, the board found that there was "no question" that Lemons violated Jud.Cond.R. 2.9(C), which prohibits a judge from independently investigating facts in a matter and requires a judge to consider only the evidence presented and any facts that may properly be judicially noticed. By conducting the wellness check of D.M.'s residence—which included thoroughly inspecting the house and interacting with the children and their grandfather—Lemons, the board concluded, "made an independent investigation of facts pertinent to what became a formal custody case brought before him as a judge" and that his investigation was the "sole basis" for his January 14 emergency order removing two of the children from D.M.'s home.

{¶ 16} Second, the board found that Lemons violated Jud.Cond.R. 2.11(A)(1), which requires a judge to disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned,

including when the judge has a personal bias or prejudice concerning a party or a party's lawyer or personal knowledge of facts that are in dispute. The board concluded that Lemons's reason for not recusing himself—that SCCSB had pursued the matter solely as a dependency case rather than a neglect case—was "flawed for two reasons." As a legal matter, the board noted, SCCSB's entire case was precipitated by Lemons's home inspection and January 14 emergency order, notwithstanding the fact that SCCSB did not mention the home conditions in its complaint or arguments. Further, as a factual matter, the board observed that the living conditions of D.M.'s home "were very much on [Lemons's] mind regardless of the legal posture of the case," as evidenced by Lemons's exchange with D.M. contrasting the conditions in D.M.'s home with what would be acceptable.

{¶ 17} Third, the board found that Lemons violated Jud.Cond.R. 2.2, which requires a judge to "uphold and apply the law" and "perform all duties of judicial office fairly and impartially." Lemons, the board found, "effectively usurped SCCSB's legal authority" by disregarding its decision to leave D.M.'s children in place, "then conducting his own investigation and, *sua sponte*, initiating a custody action." (Emphasis sic.) And Lemons took those actions, the board found, because he was frustrated with SCCSB. The board concluded that no matter how well-intentioned, Lemons "could not be both the source of a private referral based on his personal knowledge and an *impartial* arbiter of the issues as a judge." (Emphasis sic.)

{¶ 18} We adopt the board's findings of misconduct.

### Sanction

{¶ 19} When imposing sanctions for judicial misconduct, we consider all relevant factors, including the ethical duties that the judge violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

**{¶ 20}** The board found the presence of one aggravating factor—that Lemons had engaged in multiple offenses. *See* Gov.Bar R. V(13)(B)(4). As for mitigating factors, the board found that Lemons has a clean disciplinary record and had lacked a dishonest or selfish motive, made full and free disclosures to the board and had a cooperative attitude toward the disciplinary proceedings, and submitted evidence of good character and reputation. *See* Gov.Bar R. V(13)(C)(1), (2), (4), and (5).

**{¶ 21}** To determine the appropriate sanction, the board considered five cases in which we imposed public reprimands or stayed six-month suspensions on judges who had engaged in fairly similar misconduct—mostly by creating an appearance of partiality or failing to perform their duties fairly and impartially. In *Disciplinary Counsel v. Winters*, 166 Ohio St.3d 149, 2021-Ohio-2753, 184 N.E.3d 21, we imposed a conditionally stayed six-month suspension on a judge who had engaged in inappropriate ex parte communications on Facebook, failed to disclose those communications, and failed to disqualify himself from several cases in which his impartiality could reasonably be questioned. In *Disciplinary Counsel v. Goulding*, 162 Ohio St.3d 482, 2020-Ohio-4588, 165 N.E.3d 1244, we imposed a conditionally stayed six-month suspension on a judge who, in an attempt to assist his friends, had interfered in another judge's case by setting bail and securing a defendant's release from jail and also had engaged in ex parte communications with that defendant.

**{¶ 22}** In *Disciplinary Counsel v. Medley*, 93 Ohio St.3d 474, 756 N.E.2d 104 (2001), we publicly reprimanded a judge for creating the appearance of bias by accepting a phone call from a newly arrested person, picking her up from the police station and driving her home, and later presiding over her criminal proceeding. Similarly, we publicly reprimanded a judge in *Disciplinary Counsel v. Runyan*, 108 Ohio St.3d 43, 2006-Ohio-80, 840 N.E.2d 623, for attempting to take corrective action against a police detective and, in doing so, engaging in activities that went

well beyond his judicial authority and ethical constraints. The judge also failed to recuse himself from a case in which he had previously represented a party. And in *Ohio State Bar Assn. v. Goldie*, 119 Ohio St.3d 428, 2008-Ohio-4606, 894 N.E.2d 1226, we publicly reprimanded a judge for failing to remain faithful to the law when she denied three defendants due process in a flagrant disregard of their constitutional and statutory rights.

{¶ 23} The board found—and we agree—that Lemons's misconduct was not as serious as the misconduct in the cases cited above. For example, the board noted that unlike the judges in *Goulding* and *Runyan*, Lemons had not been influenced by personal relationships or self-interest. Rather, the board concluded that Lemons had been "motivated by the best of intentions" and that his actions had likely benefited D.M.'s children by removing them from an environment without capable caregivers. The board also noted that in *Runyan* and *Goldie*, we issued public reprimands for misconduct arising out of multiple cases but that Lemons's misconduct "was confined to a single chain of events." However, the board concluded that "the isolated nature of this incident and [Lemons's] good intentions do not excuse his disregard for ethical standards that are designed to promote fairness and impartiality."

{¶ 24} After reviewing the record in this case and the sanctions that we have imposed for comparable misconduct, we agree that a public reprimand is the appropriate sanction here. Lemons's good intentions do not excuse him from complying with the Code of Judicial Conduct. *See Disciplinary Counsel v. Elum*, 133 Ohio St.3d 500, 2012-Ohio-4700, 979 N.E.2d 289, ¶ 26, quoting *Disciplinary Counsel v. Hoague*, 88 Ohio St.3d 321, 324, 725 N.E.2d 1108 (2000), quoting *Disciplinary Counsel v. Ferreri*, 85 Ohio St.3d 649, 654, 710 N.E.2d 1107 (1999) (a judge's "understandably strong feelings" about an arresting officer's misconduct " ' "do not excuse a judge from complying with the judicial canons and the Disciplinary Rules" ' ").

**Conclusion**

{¶ 25} Richard Alan Lemons is hereby publicly reprimanded for his misconduct in this case. Costs are taxed to Lemons.

Judgment accordingly.

KENNEDY, FISCHER, DEWINE, DONNELLY, STEWART, and BRUNNER, JJ., concur.

O'CONNOR, C.J., concurs, with an opinion.

_____

**O'CONNOR, C.J., concurring.**

{¶ 26} I join the majority opinion. Respondent Judge Richard Lemons's breach of the Code of Judicial Conduct is true enough, and I therefore agree with the Board of Professional Conduct that a public reprimand is necessary. The public reprimand we impose today will remain a part of Lemons's disciplinary record.

{¶ 27} I write separately, however, because Lemons's disciplinary record unfortunately will not illuminate that he was not acting in self-interest but in the interests of D.M.'s children who were living in an unsafe and unsanitary environment. Standing alone, the disciplinary record will not inform the public of the majority opinion's recognition that Lemons was motivated by the best of intentions. Not only do I agree with that characterization of Lemons's intentions, but I would go a step further and observe that his actions ultimately benefited D.M.'s children by removing them from a dangerous environment devoid of capable caregivers and that left the children at risk of a tragedy occurring at any minute.

{¶ 28} It was the responsibility of the Scioto County Children Services Board to ensure the safety of D.M.'s children. Lemons felt compelled to act only when others had neglected their duty to remove the children from an unsafe environment. It is undeniable that Lemons went beyond what the Code of Judicial

10

Conduct permits and must be sanctioned. But in my mind, he is also to be commended for securing the safety of D.M.'s children.

_____

Joseph M. Caligiuri, Disciplinary Counsel, and Michelle R. Bowman and Michelle A. Hall, Assistant Disciplinary Counsel, for relator.

Montgomery Jonson, L.L.P., and Lisa Zaring, for respondent.

_____