**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Disciplinary Counsel v. Hoover***, Slip Opinion No. 2024-Ohio-4608.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2024-OHIO-4608

DISCIPLINARY COUNSEL *v.* HOOVER.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Hoover*, Slip Opinion No. 2024-Ohio-4608.]**

*Judges—Misconduct—Violations of the Code of Judicial Conduct and the Rules of Professional Conduct—18-month suspension, with six months conditionally stayed, and immediate suspension from judicial office without pay for duration of disciplinary suspension.*

(No. 2023-0188—Submitted May 17, 2023—Decided September 24, 2024.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2021-034.

_____

FISCHER, J., authored the opinion of the court, which KENNEDY, C.J., and DONNELLY, STEWART, and DETERS, JJ., joined. DEWINE, J., concurred in judgment only. BRUNNER, J., did not participate.

**FISCHER, J.**

{¶ 1} Respondent, Kim Richard Hoover, of Stow, Ohio, Attorney Registration No. 0002331, was admitted to the practice of law in 1979 and serves as a judge on the Stow Municipal Court. Relator, disciplinary counsel, alleged in a May 2022 amended complaint that Hoover had committed 48 violations of the Code of Judicial Conduct and 16 violations of the Rules of Professional Conduct based on his methods of collecting fines and court costs from 16 municipal-court defendants. Following a hearing, a three-member panel of the Board of Professional Conduct concluded that Hoover committed all 64 of the alleged violations and recommended that Hoover be suspended from the practice of law for two years. The board adopted the panel's findings of fact, conclusions of law, and recommended sanction, and further, it recommended that Hoover be suspended from judicial office, without pay, for the duration of his suspension.

{¶ 2} Hoover objects to the board's findings and the recommended sanction. Hoover argues that a one-year suspension from the practice of law, with six months stayed, is appropriate.

{¶ 3} After review, we agree with the board that Hoover committed the alleged violations; however, we find that the appropriate sanction is an 18-month suspension from the practice of law with the final six months of the suspension stayed on the condition that Hoover commit no further misconduct. Hoover is also immediately suspended from judicial office without pay for the duration of his suspension.

## I. FINES, COSTS, AND INCARCERATION

{¶ 4} Our criminal-justice system strives to ensure that no matter how rich or poor, each defendant receives equal justice under the law. *See Bearden v. Georgia*, 461 U.S. 660, 664 (1983). "The overriding purposes of misdemeanor sentencing are to protect the public from future crime . . . and to punish the offender." R.C. 2929.21(A). Unless a jail term is required by the Revised Code, a

court that sentences an offender for a misdemeanor or minor misdemeanor "has discretion to determine the most effective way to achieve the purposes and principles of [misdemeanor] sentencing." R.C. 2929.22(A). Such a punishment may include a financial sanction by means of a fine. *See* R.C. 2929.28(A)(2). And the court is required to impose various costs related to the prosecution and sanctions imposed against the defendant. *See* R.C. 2947.23; R.C. 2929.28(A)(3); *State v. Taylor*, 2020-Ohio-3514, ¶ 6.

{¶ 5} Fines and costs are treated differently in our criminal-justice system. The General Assembly has set forth a procedure in R.C. 2947.14 by which offenders may be incarcerated for failing to pay their fines. A court may order that an offender be jailed for failing to pay a fine that is a part of the offender's sentence if the court determines at the offender's sentencing hearing that "the offender is able, at that time, to pay the fine but refuses to do so." R.C. 2947.14(A). The offender is entitled to several procedural safeguards during this process, like the right to be represented by counsel and to present evidence as to his or her ability to pay the fine. R.C. 2947.14(B). It is only after the court finds that the offender has the ability to pay the fine at the hearing and the offender has failed to pay the fine that the court can issue a warrant for the offender's arrest. R.C. 2947.14(C).

{¶ 6} An offender who is arrested and taken into custody under R.C. 2947.14(C) is also entitled to a hearing on the "first regularly scheduled court day following the date of arrest in order to inform the court . . . of any change of circumstances that has occurred since the time of sentencing." *Id.* At this change-of-circumstances hearing, the offender has the right to testify and present evidence regarding his or her inability to pay the fine. *Id.* If, after the hearing, the court finds that the offender is able to pay the fine, the court must support that determination with findings of fact in a judgment entry. *Id.* If an offender is imprisoned under R.C. 2947.14, that offender receives a credit toward his or her fine of $50 per day or a fraction of a day that he or she is incarcerated. R.C. 2947.14(D). The General

Assembly has expressly prohibited courts from imprisoning offenders in satisfaction of a fine except as provided by R.C. 2947.14. R.C. 2947.14(D).

{¶ 7} As for costs, a court cannot order that a defendant be sent to jail for failing to pay court costs. *See Taylor*, 2020-Ohio-3514, at ¶ 21. The imposition of court costs is civil in nature and, constitutionally, a person cannot be imprisoned for his or her failure to pay a civil debt. *Taylor* at ¶ 21; Ohio Const., art. I, § 15. Rather, the court can order the defendant to perform community service in satisfaction of the costs or place the defendant on an approved payment plan for the costs, so long as the court follows the proper procedural requirements. *See* R.C. 2947.23; *Taylor* at ¶ 22.

{¶ 8} It is absolutely imperative that courts do not jail offenders for failing to pay their court costs, as such an action is forbidden by the Ohio Constitution. Ohio Const., article I, § 15 ("No person shall be imprisoned for debt in any civil action . . . ."); *see also Strattman v. Studt*, 20 Ohio St.2d 95, 102-103 (1969). To help judges navigate this legal framework, since 2014, this court has provided each Ohio judge with a bench card that explains the rules concerning the imposition and collection of *fines* and *costs* and when incarceration is authorized for nonpayment of *fines*. *See* Bret Crow, *Bench Card Offers Guidance On Collection of Court Fines, Costs*, Court News Ohio (Feb. 4, 2014), https://www.courtnewsohio.gov /happening/2014/benchCards_020414.asp (accessed July 29, 2024).

{¶ 9} While this court has made numerous revisions to the bench card, each version has explained the difference between fines, which are a criminal sanction, and court costs, which are a civil obligation. And each version of the bench card has made clear that R.C. 2947.14 is the sole and exclusive authority to commit an offender to jail for willful refusal to pay a fine in a criminal case. *See, e.g.*, Bench Cards, Guides, & Toolkits, The Supreme Court of Ohio, *Collection of Court Costs & Fines in Adult Trial Courts*, https://www.supremecourt.ohio.gov/docs /Publications/JCS/finesCourtCosts.pdf (accessed July 29, 2024)

[https://perma.cc/7HM4-P35S].[1]  Additionally, the bench card informs judges that they must segregate fines from court costs and cannot order a person to appear or issue a warrant for unpaid court costs.  *Id.*  And as explained in the bench card, a person may be jailed for *a willful refusal* to pay a fine that the person has *the ability to pay*.  *Id.*; *see also* R.C. 2947.14(A); *State v. Ellis,* 2008-Ohio-2719, ¶ 13 (2d Dist.).

{¶ 10} In the bench card, this court has explained how courts may enforce fines by imposing jail, listing the procedural safeguards designed to ensure a defendant is not wrongfully jailed:  (1) segregating fines from costs and other financial sanctions, (2) providing reasonable notice to the defendant of a hearing, (3) conducting an evidentiary, economic-ability-to-pay hearing, (4) advising the defendant of the right to counsel, (5) providing the defendant with the opportunity to be heard, and (6) making a specific finding that the defendant has the ability to pay the fine and willfully refuses to do so. Additionally, as we recently observed in *Disciplinary Counsel v. Carr*, 2022-Ohio-3633, ¶ 30, "the bench card is replete with citations to caselaw and statutes indicating that a person's ability to pay must be considered when assessing and collecting fines."  In the May 2021 version of the bench card submitted by the parties as a joint exhibit, this court clarified that judges may not collect fines, costs, or other fees by setting bond based on the amount owed and that "[i]ncarceration for nonpayment [of fines] should only be used as a last resort and after compliance with all statutory and procedural safeguards."

---

1. In addition to the version of the bench card currently available on the Ohio Supreme Court website, the parties have included the February 2014 and May 2021 versions of the bench card as stipulated exhibits.  Moreover, at least one other revised version of the bench card was published in March 2022.  *See Disciplinary Counsel v. Carr*, 2022-Ohio-3633, ¶ 30 (citing to the March 2022 version of the bench card).

## II. ALLEGED VIOLATIONS

**{¶ 11}** Disciplinary counsel alleged that Hoover committed 48 violations of the Code of Judicial Conduct and 16 violations of the Rules of Professional Conduct as a result of the methods he used to collect fines and costs from 16 municipal-court defendants. Specifically, disciplinary counsel charged Hoover with 16 counts, with each count alleging the same four violations: (1) Jud.Cond.R. 1.2 (2) Jud.Cond.R. 2.2; (3) Jud.Cond.R. 2.3(B); and (4) Prof.Cond.R. 8.4(d).

**{¶ 12}** Jud.Cond.R. 1.2 requires a judge to act at all times in a manner that "promotes public confidence in the independence, integrity, and impartiality of the judiciary" and to "avoid impropriety and the appearance of impropriety." A judge can create the appearance of impropriety by making "inappropriate comments" or by demonstrating a "lack of proper judicial demeanor." *Disciplinary Counsel v. Porzio*, 2020-Ohio-1569, ¶ 9. And "[a]ctual improprieties include violations of law, court rules, or provisions of [the Code of Judicial Conduct.]" Jud.Cond.R. 1.2, Comment 5.

**{¶ 13}** Jud.Cond.R. 2.2 requires a judge to "uphold and apply the law" and "perform all duties of judicial office fairly and impartially." "To ensure impartiality and fairness to all parties, a judge must be objective and open-minded." Jud.Cond.R. 2.2, Comment 1. Further, "a judge must interpret and apply the law *without regard* to whether the judge approves or disapproves of the law in question." (Emphasis added.) Jud.Cond.R. 2.2, Comment 2. Good-faith errors made by the judge do not constitute violations of Jud.Cond.R. 2.2. Jud.Cond.R. 2.2, Comment 3; *compare Carr*, 2022-Ohio-3633, at ¶ 29-32 (judge found to have committed numerous violations of Jud.Cond.R. 2.2 by improperly using capias warrants to collect fines and court costs) *with Disciplinary Counsel v. Gaul*, 2023-Ohio-4751, ¶ 44, *quoting In re Judges of Mun. Court of Cedar Rapids*, 256 Iowa 1135, 1136 (1964) (explaining that a judge cannot be disciplined for a mere exercise

in judicial discretion, as the "'remedy for mistakes of law or fact in individual cases is by appeal, certiorari, or other proper proceeding' ").

{¶ 14} Jud.Cond.R. 2.3(B) prohibits a judge from using language or acting in a manner that could be perceived as engaging in bias, prejudice, or harassment based on matters like race, disability, or socioeconomic status. A judge may demonstrate bias or prejudice by using the following: "epithets; slurs; demeaning nicknames; negative stereotyping; [or] attempted humor based upon stereotypes." Jud.Cond.R. 2.3, Comment 2; *see Gaul* at ¶ 23-25 (judge found to have violated Jud.Cond.R. 2.3(B), among other rules, by demeaning an African-American defendant by calling him a "brother," a "murderer," and a "remorseless predator"). Further, a judge may demonstrate bias or prejudice by engaging in "threatening, intimidating, or hostile acts." Jud.Cond.R. 2.3, Comment 2.

{¶ 15} A judge may also exhibit bias or prejudice by making "irrelevant references to personal characteristics." *Id.* Additionally, manifestations of bias or prejudice may come in the form of a judge's "facial expressions and body language." *Id.* However, we have recognized that an adverse ruling, without more, is not evidence that a judge is biased or prejudiced. *In re Disqualification of Bickerton*, 2023-Ohio-1104, ¶ 9. Judges are permitted to express dissatisfaction, but that dissatisfaction should be expressed in a manner that nonetheless promotes public confidence in the judiciary. *See id.* at ¶ 8.

{¶ 16} And Prof.Cond.R. 8.4(d) prohibits a lawyer from "engag[ing] in conduct that is prejudicial to the administration of justice." Dishonesty or a breach of trust, especially over a series of repeated offenses, "can indicate indifference to legal obligation" and serve as a violation of Prof.Cond.R. 8.4. Prof.Cond.R. 8.4, Comment 2.

### III. MISCONDUCT

{¶ 17} This court is the "final arbiter" of attorney and judicial discipline. *Disciplinary Counsel v. Hunter*, 2023-Ohio-4168, ¶ 21; *see also Cincinnati Bar*

7

*Assn. v. Powers*, 2008-Ohio-4785, ¶ 21. We "render[] the final determination of the facts and conclusions of law" and are "not bound by the [Board of Professional Conduct's] findings of fact or conclusions of law. *Ohio State Bar Assn. v. Reid*, 85 Ohio St.3d 327 (1999), paragraph one of the syllabus.

{¶ 18} Disciplinary counsel bears the burden of proving by clear and convincing evidence the facts necessary to establish a violation. *Id.* at paragraph two of the syllabus. Here, Hoover and disciplinary counsel submitted 200 factual stipulations and 176 stipulated exhibits. Additionally, the parties stipulated to three aggravating factors and four mitigating factors. Hoover has stipulated to violating Jud.Cond.R. 2.2 in Counts 1 and 4, but he has contested all other charged violations.

{¶ 19} Hoover has raised a single objection before this court, contesting the board's findings regarding professional misconduct and aggravating factors, as well as its recommended sanction. With respect to the board's findings of professional misconduct,[2] Hoover breaks the 16 cases down into three categories: (1) "[d]efendants who were not jailed following their hearing"; (2) "[d]efendants sentenced to serve previously issued jail time"; and (3) "[d]efendants who were told they could be released early if they paid their fines and costs, or some portion thereof." Hoover's main argument is that many of these defendants were not ordered to jail for failing to pay their fines and costs, but rather, he jailed or threatened to jail them because they had shown themselves to be irresponsible. Specifically, Hoover argues that R.C. 2947.14 does not apply to seven defendants because they were not incarcerated or threatened with incarceration due to

---

2. Hoover supports three of his arguments to this court by citing to the posthearing brief he submitted to the board and noting that portions of that brief are "incorporated as if restated herein." This court's rules require parties' briefs to contain arguments relevant to their positions. S.Ct.Prac.R. 16.02. As we stated in *Gaul*, 2023-Ohio-4751, at ¶ 11, we have no intention of permitting parties to incorporate arguments made to this court by referencing prior briefs. However, since *Gaul* was decided while Hoover's case was pending before this court, and in the interest of giving all of Hoover's arguments full consideration, we reluctantly consider the arguments that he has incorporated by reference in his objection to the board's report.

nonpayment but rather due to irresponsibility for prior conduct, namely, failing to appear for past court dates or failing to pay fines and costs imposed for an earlier conviction. He argues that R.C. 2947.14 does not apply to three other defendants, because they had previously been convicted and ordered to serve jail time if they did not comply with the court's orders. And Hoover argues that he fashioned alternatives to incarceration for four defendants who could make financial payments—that is, "serve jail or pay the fine."

{¶ 20} Hoover maintains that because, in his view, R.C. 2947.14 does not apply to the 14 defendants among the three categories he identified in his objection, the violations of Jud.Cond.R. 1.2 and 2.2 and Prof.Cond.R. 8.4(d) are not supported in those respective counts. And while Hoover concedes that R.C. 2947.14 applied to two defendants and he therefore committed two violations of Jud.Cond.R. 2.2, he maintains that he did not violate Jud.Cond.R. 1.2 or Prof.Cond.R. 8.4(d) in those cases, because even though he made "mistakes" in those matters, his conduct does not amount to a "fail[ure] to promote public confidence in the independence, integrity, and impartiality of the judiciary" or an "ethical impropriety."

{¶ 21} Disciplinary counsel maintains that R.C. 2947.14 applied in all 16 defendants' cases, but he contends that even if it did not, Hoover still violated Jud.Cond.R. 1.2, 2.2, and 2.3(B) and Prof.Cond.R. 8.4(d) given his "coercive, draconian tactics to compel payment of fines and costs." Disciplinary counsel stresses that "[t]hreatening incarceration on non-jailable offenses to compel payment of fines and costs—regardless of the statute—constitutes unethical conduct."

{¶ 22} Hoover also maintains that the evidence does not support the board's findings that he treated defendants with a bias or prejudice in violation of Jud.Cond.R. 2.3(B). Hoover argues that 16 out of the thousands of cases that he has presided over during his lengthy service as a judge do not demonstrate how he runs his courtroom. He emphasizes his deep commitment to his community and

explains that his objective was to "impose a punishment that was actually *impactful* on these defendants and did not allow them to skirt responsibility." (Emphasis in original.) During oral argument, Hoover's counsel specifically noted that the board had found that Hoover was genuine when he testified that his collection of fines and costs was about more than money, and specifically, that these efforts were about his obligation to hold defendants accountable and teach them responsibility. His counsel further argued that Hoover cannot be found to have exhibited prejudice when he was following the purposes and principles of misdemeanor sentencing. *See* R.C. 2929.21.

{¶ 23} After reviewing the record, we adopt the board's findings of misconduct regarding the stipulated rule violations. We turn our focus to the remaining 62 charged violations that Hoover disputes and his objections to the board's report.

### A. Count 1: the Dawson Matter

{¶ 24} In July 2019, Douglas Dawson was charged with driving under suspension, a nonjailable offense with a maximum penalty of a $1,000 fine. The court issued a warrant for Dawson's arrest when he failed to appear for his arraignment.

{¶ 25} In September 2019, Dawson was arrested and appeared without counsel before Hoover for the arraignment. Dawson pleaded guilty to the offense, and Hoover sentenced him to a $100 fine and court costs, totaling $537. Hoover noted on the entry that Dawson was to pay $100 in two weeks and the remaining balance within 30 days, or else he would be required to return to court. Dawson failed to pay anything by Hoover's initial deadline, but he returned to court several days later and paid $100 toward his fines and costs.

{¶ 26} Hoover set another hearing date for Dawson to return to court on the matter a month later if Dawson had not yet paid the remaining balance. Dawson,

10

however, made no additional payments and failed to appear. Thus, a magistrate issued a capias for his arrest.

{¶ 27} Dawson was arrested and jailed a month later on the outstanding capias. Dawson appeared before Hoover the following day. Hoover explained that Dawson had previously been given a month to pay the fines and costs or come back to court, and he had failed to do either. Hoover stated, "After I give you that kind of a break, I don't give you another one." Hoover then informed Dawson that he needed to pay $507 or he would "stay about ten days" in jail.

{¶ 28} Dawson attempted to tell Hoover that he would not get paid until a certain date, but Hoover refused to listen. He interrupted Dawson and stated, "Oh, man, you're going to be staying then. Once I've given you the break . . . and you blow it off. I don't want to hear anymore." Dawson attempted to explain that serving time would affect his employment, and Hoover responded, "Yeah. It probably will. That's the problem with screwing with me. . . . When it comes time, I don't care. And that's where we're at right now." Hoover explained that if Dawson could come up with the money, he would be out of jail sooner, getting a $50 credit for each day he served. Hoover said, "So if you came up with $407, they'd release you. Tomorrow you come up with $357, they'd release you. If you don't come up with anything, they're gonna release you" when there is no longer a balance.

{¶ 29} Hoover ordered Dawson released upon payment in full or on the date when the $50 credit he received for each day in jail was enough to satisfy the total amount due. Dawson could not pay his fines and costs and, as a result, he spent seven more days in custody. Upon his release from jail, Hoover credited Dawson with $350.

{¶ 30} Disciplinary counsel charged Hoover with violations of Jud.Cond.R. 1.2, 2.2, and 2.3(B) and Prof.Cond.R. 8.4(d). The board agreed with disciplinary counsel and determined that Hoover had violated all four rules specified in Count

1.   In his objections to the board's report, Hoover concedes that he violated Jud.Cond.R. 2.2 when he sent Dawson to jail without the legal authority to do so, but he maintains that he did not violate Jud.Cond.R. 1.2 and 2.3(B) or Prof.Cond.R. 8.4(d).  Hoover insists that it was not his intention to manifest bias or prejudice based on socioeconomic status in sending Dawson to jail.  After reviewing the record, we agree with the board.

{¶ 31} Hoover had Dawson arrested for failing to pay his fines and costs.  However, Hoover failed to segregate the fines and costs, as he was required to do by law, *see State v. Swift*, 2005-Ohio-1599, ¶ 29 (2d Dist.).  And Hoover ignored the applicable law establishing that a defendant cannot be incarcerated for failing to pay court costs.  *See Strattman*, 20 Ohio St.2d at 102-103.  Moreover, Hoover did not hold any discussion with Dawson about his right to counsel concerning his ability to pay his fines, *see* R.C. 2947.14(B), which is harmful to an unrepresented defendant.

{¶ 32} And Hoover acted with a level of indifference toward Dawson that is prejudicial to the administration of justice.  Hoover's statements at the hearing show that he did not care that Dawson's employment—one way that Dawson would be able to make payments toward his fines and costs—would be in jeopardy were he incarcerated.  And most concerning was Hoover's statement to Dawson that failing to pay fines and costs on time was "screwing" with Hoover.  A defendant's failure to pay fines in a timely manner, without the court determining the reason for such a failure, is insufficient to justify incarceration and certainly cannot be deemed a purposeful act of "screwing" with the court.  Hoover's explicit disregard for the law and the decorum and respect owed to the bench by using that type of demeaning commentary was prejudicial to the administration of justice, and it weakens the public's perception of a fair and independent judiciary.  Therefore, we agree with the board that Hoover violated Jud.Cond.R. 1.2 and Prof.Cond.R. 8.4(d).

{¶ 33} As for Jud.Cond.R. 2.3(B), we also find that there is sufficient evidence to support the board's finding that Hoover manifested bias or prejudice on the basis of socioeconomic status in the performance of his official duties. Hoover's disdain for Dawson was made apparent during Hoover's testimony at his disciplinary hearing:

> [Relator]: And you agree [that Dawson] should have never spent a night in jail in this case, it's a non-jailable offense?
>
> [Hoover]: If you saw Dawson's record, you'd think any time he spent in jail was a good thing for the world.

Hoover jailed Dawson for seven days because of Dawson's inability to pay his fines and costs and due to his criminal record. Hoover admitted that if Dawson could have paid, then he would not have served time in jail. Hoover's actions go beyond a simple mistake of failing to follow the law and the record supports a finding of a violation of Jud.Cond.R. 2.3(B).

{¶ 34} Therefore, we adopt the board's findings that Hoover violated Jud.Cond.R. 1.2, 2.2, 2.3(B) and Prof.Cond.R. 8.4(d) in the Dawson matter.

### B. Count 2: the Smitherman Matter

{¶ 35} In February 2020, Darcell Smitherman was arrested and charged with criminal trespass, a fourth-degree misdemeanor. Smitherman appeared before Hoover by video conference the following day. Hoover informed Smitherman that criminal trespass carried a penalty of a maximum fine of $250 and a jail term of up to 30 days. Smitherman pleaded not guilty and informed the court that he wished to take the matter to trial. Hoover then reviewed Smitherman's past criminal conduct, noting that Smitherman "owe[d] hundreds of dollars." Smitherman asked if there was a possibility that he could be released and Hoover said, "Yeah, I don't want you released owing five or six thousand dollars for former trespasses."

Hoover informed Smitherman that he intended to look over Smitherman's criminal record to see if he had an "excuse to transfer" Smitherman to the Community Alternative Sentencing Center ("CASC") or "some other jail."

{¶ 36} Hoover observed that it was unlikely Smitherman would be held in the Summit County jail for the criminal-trespass charge before going on to explain:

> I'm tired of playing with you just like the deputies are. You make a fool of the system by constantly being arrested for the exact same thing, never paying a dime, and by doing that, you know that the jail won't hold you on a misdemeanor in the fourth degree. Therefore, you get out and you do the exact same thing again and none of it matters to you, so this time, I'm going to try to get clever, figure out a reason to hold you for a month or two 'cause I gotta do something to punish you or you'll just keep doing the same old, same old.

When Smitherman asked again if he would be released, Hoover responded, "I'm hoping not."

{¶ 37} Smitherman had $500 in outstanding fines, $1,841 in outstanding costs, and 40 days of incarceration that had been previously suspended, stemming from five prior convictions in the Stow Municipal Court. Hoover, in an order entered that day, noted that Smitherman had repeatedly been convicted of criminal trespass and had "always failed to pay fines/costs or do community service to satisfy his debts and/or return to court to address these issues." Hoover ordered that Smitherman be remanded to CASC for 30 days and also credited him with $1,500 toward his outstanding fines and costs.

{¶ 38} Hoover did not advise Smitherman of his right to counsel. Nor did he segregate the fines from costs or inquire into Smitherman's ability to pay.

**{¶ 39}** Smitherman eventually pleaded guilty to the criminal-trespass offense before a different judge. He was sentenced to 30 days in jail but was credited with 17 days for the time already served under Hoover's order.

**{¶ 40}** Disciplinary counsel charged Hoover with violations of Jud.Cond.R. 1.2, 2.2, and 2.3(B) and Prof.Cond.R. 8.4(d). The board concluded that the violations were supported by sufficient evidence. It found that Hoover had "imposed suspended jail time on Smitherman without any procedural due process." Hoover objects to these findings, arguing that Smitherman was ordered to serve "previously issued jail time." Disciplinary counsel maintains that Hoover's decision to incarcerate Smitherman was about "punishing a repeat offender who [had] repeatedly failed to pay his fines and costs." We agree with the board's findings.

**{¶ 41}** A judge who makes an error of law in good faith or commits "'a mere mistake in the exercise of judicial discretion'" is not and should not be subject to disciplinary proceedings under the Code of Judicial Conduct. *Gaul*, 2023-Ohio-4751, at ¶ 44, quoting *Mahoning Cty. Bar Assn. v. Franko*, 168 Ohio St. 17, 30 (1958); *see also* Jud.Cond.R. 2.2, Comment 3. The remedy for good-faith errors of fact or of law is an appeal, as "'[a] judge has a right to be wrong so far as any discipline by [a court is] concerned except as his decisions may be reversed or writs sustained.'" (Second brackets added in *Gaul*.) *Gaul* at ¶ 44, quoting *Judges of Mun. Court of Cedar Rapids*, 256 Iowa at 1136. In *Gaul*, we determined that a judge who failed to follow the proper procedure in determining bond could not be subjected to attorney discipline. *Id*. at ¶ 46-50.

**{¶ 42}** However, we find that Hoover's actions went beyond a simple mistake. Hoover maintains that he incarcerated Smitherman for a previously issued suspended sentence. This assertion is not supported by the record. A court "'speaks only through its journal.'" *State v. Leegrand*, 2022-Ohio-3623, ¶ 8, quoting *Schenley v. Kauth*, 160 Ohio St. 109 (1953), paragraph one of the syllabus. And

here, as indicated by the journal entry, Hoover incarcerated Smitherman for being a repeat offender who had failed to pay previously imposed fines and costs.

{¶ 43} The record demonstrates that Hoover did not make a good-faith effort to follow the law and instead wanted to come up with a "clever" way to keep Smitherman in jail. Even if Hoover had imposed jail time on Smitherman based on suspended sentences, as he argues in his objections, Hoover imposed suspended jail time on Smitherman without any due process.

{¶ 44} At his disciplinary hearing, Hoover agreed that he did not give notice to Smitherman regarding the purported revocation of his suspended sentences, his right to counsel, or other procedural guarantees, *see* Crim.R. 32.3. In an effort to justify his actions depriving Smitherman of the due process that he was owed, Hoover said that in order to give Smitherman adequate notice, "We'd have to create the Darcell Smitherman Municipal Court." This is not the type of attitude that judges should hold when a defendant has been deprived of the rights owed to him under our law. Furthermore, if Hoover had appropriately incarcerated Smitherman for the $500 in fines that he owed, Hoover could only have incarcerated Smitherman for 10 days, not 30 days, based on the $50-per-day jail credit provided in R.C. 2947.14(D).

{¶ 45} We have explained before that when a judge has no appreciation for the fact that a reasonable person may recognize that these sorts of actions are problematic, this supports a determination that the judge "is not able to view his conduct objectively," which may create an appearance of impropriety. *In re Disqualification of Winkler*, 2013-Ohio-890, ¶ 12. Hoover's interaction with Smitherman and his testimony at his disciplinary hearing show a biased attitude toward Smitherman that is inappropriate and prejudicial to the administration of justice.

{¶ 46} Hoover ignored the law and attempted to justify his actions after the fact based on his claim that he believed it was in the public's best interest to hold

Smitherman in jail, even if he acted at the expense of Smitherman's rights. Therefore, we agree with the board that the record supports findings that Hoover (1) acted in a manner prejudicial to the public's confidence in the independence, integrity, and impartiality of the judiciary, (2) failed to uphold and apply the law and perform all judicial duties fairly and impartially, (3) engaged in conduct that manifested a bias or prejudice against socioeconomically disadvantaged people, and (4) acted in a manner that was prejudicial to the administration of justice. This conduct violated Jud.Cond.R. 1.2, 2.2, and 2.3(B) and Prof.Cond.R. 8.4(d).

### C. Count 3: the Fovozzo Matter

{¶ 47} Frank Fovozzo was charged with various offenses in two cases, including operating a vehicle while under the influence (OVI) and resisting arrest. In August 2020, Fovozzo pleaded guilty to reduced charges of a physical-control violation in his OVI case and to an open-container offense in the resisting-arrest case. He was sentenced to serve three days in jail and pay a total of $976 in fines and costs for both cases. Fovozzo entered into a payment plan, agreeing to pay $244 a month for four months toward his fines and costs, and he made his first payment on time.

{¶ 48} In October 2020, Fovozzo was arrested for failure to reinstate and display his driver's license, both unclassified misdemeanor offenses. He appeared before Hoover without counsel. After Fovozzo pleaded not guilty to the nonjailable offenses, Hoover began questioning him about his prior cases and the fines and costs associated with them.

{¶ 49} Fovozzo explained to Hoover that he was going through a hard time—he had lost his job and was being evicted from his home, and he did not have the money to pay his fines and costs. Hoover responded that Fovozzo's previous charges and convictions "[don't] sound like poverty." When Fovozzo attempted to correct Hoover by explaining that he had not been convicted of resisting arrest and

OVI, Hoover responded that he was looking at the amount Fovozzo currently owed and what he had originally been charged with.

{¶ 50} Hoover noted that he did not believe that Fovozzo had "done anything" to pay the fines and costs from his prior cases. Fovozzo explained to Hoover that he had had a public defender who helped him plead down his prior charges. Hoover asked Fovozzo again why he had made no attempt to take care of his prior cases. Fovozzo answered, "I just don't have the money." Fovozzo emphasized that he wanted to pay but that he was "down on [his] luck." Hoover responded, "I want to play shortstop for the Yankees, but hoping is not going to get the job done. Wanting doesn't get the job done."

{¶ 51} Hoover then proceeded to inquire as to how Fovozzo was eating. Fovozzo explained that he was "barely" eating. Hoover retorted, "[I meant] how are you . . . getting money for food," to which Fovozzo replied, "I got a little bit of money in my account." Following up, Hoover asked, "Why won't you answer my questions?" Confused, Fovozzo repeated Hoover's first question, "[H]ow am I eating?" Hoover responded by asking how Fovozzo was paying any bills. Fovozzo then explained that he had a little bit of money in his account because a family member had lent him $2,000. Upon learning that, Hoover asked Fovozzo how much he was willing to pay on his prior cases. Fovozzo responded that he could not pay anything "right now." Hoover then replied, "All right. I'm gonna put you in jail then. And here's the good news though, I'm gonna give you credit for $50 a day. That way you don't have to worry about food, clothing, anything."

{¶ 52} Fovozzo asked Hoover about his charge for driving under suspension and reminded him that he needed a public defender. Hoover answered, "Well I'll get you a public defender if you're not employed." However, Hoover then said, "Whoops, I can't give you the public defender . . . [because] you can only get the public defender if it's a case you can go to jail for."

18

{¶ 53} Hoover did not inquire further into Fovozzo's ability to pay or advise him that he had a right to have counsel present at the proceeding. Fovozzo was then detained in the courthouse for five hours with other defendants until he used a credit card to pay $622.50, the balance owed on the two prior cases. Hoover and disciplinary counsel agree that after adjustments and credit-card fees, Fovozzo paid $875.65 in full satisfaction of his fines and court costs.

{¶ 54} Disciplinary counsel charged Hoover with violations of Jud.Cond.R. 1.2, 2.2, and 2.3(B) and Prof.Cond.R. 8.4(d), and the board found that the charged violations were supported by sufficient evidence. The board found that Hoover did not follow the law because he did not provide the required due process, make the requisite inquiries, or segregate Fovozzo's fines from his costs. The board found that Hoover's conduct was prejudicial to the administration of justice and weakened the public's perception of a fair and independent judiciary. Further, it found that Hoover demonstrated bias toward Fovozzo based on his socioeconomic status. The board supported these findings with its determination that had Fovozzo been able to pay his outstanding fines and costs immediately, he would not have been detained and threatened with incarceration. Additionally, the board emphasized that Hoover's comments to Fovozzo were sarcastic and demeaning.

{¶ 55} Hoover objects to the violations because Fovozzo did not serve any time in jail for nonpayment. At his disciplinary hearing, Hoover justified his holding Fovozzo at the court by claiming that it was an effort to see "what the rest of the—the next couple hours did." Hoover has provided no other basis for why he did not commit the alleged violations.

{¶ 56} We agree with the board. Just because Fovozzo did not end up being transported to jail does not mean that Hoover did not keep him in custody for failing to pay his fines and costs. Without any meaningful inquiry into Fovozzo's ability to pay, without giving Fovozzo prior notice, and without advising Fovozzo that he had a right to have counsel present at the proceeding, Hoover had Fovozzo held in

a secured area in the court, with several other defendants, until he could be transported to jail or obtain the funds needed to pay the fines and costs on the closed cases. Hoover stipulated that he had Fovozzo "held in custody." Hoover's disregard for the law and the defendant's due-process rights constitutes a violation of Jud.Cond.R. 1.2 and 2.2 and Prof.Cond.R. 8.4(d).

{¶ 57} As for Jud.Cond.R. 2.3(B), the audio recording of Fovozzo's hearing and the hearing transcript reveal that Hoover's attitude and commentary demonstrated a clear violation of the rule. The statements concerning Fovozzo's ability to pay rent and eat—and particularly Hoover's commentary noting that Fovozzo would not need to worry about either when he was incarcerated— manifested a bias and prejudice toward Fovozzo based on his socioeconomic status.

{¶ 58} While incarceration is certainly a useful deterrent when properly employed, judges cannot simply wield this stick in any manner that they deem fit. Judges must follow the law and required procedures to the best of their ability. That did not happen here. We agree with the board that Hoover violated Jud.Cond.R. 1.2, 2.2, and 2.3(B) and Prof.Cond.R. 8.4(d).

### D. Count 4: the Cannon Matter

{¶ 59} In October 2018, Matthew Cannon was arrested and charged with driving under suspension, an unclassified misdemeanor, and turning at intersection, a minor misdemeanor—both nonjailable offenses. When Cannon failed to appear for his arraignment, Hoover issued a capias for his arrest.

{¶ 60} Cannon was eventually arrested on the outstanding warrant nearly a year later. He appeared at his arraignment without counsel and pleaded guilty to both charges. Hoover sentenced Cannon to pay a total of $125 in fines for both offenses and ordered him to pay $442 in court costs. In the entry, Hoover ordered Cannon to pay before he was released or return to court three days later with a credit of $50 per day for each day he spent in jail. When Cannon could not pay that day,

he was incarcerated for four days. Hoover did not inform Cannon that he was entitled to counsel; nor did he conduct an ability-to-pay hearing.

{¶ 61} When Cannon was brought back to court, Hoover credited him with $250—$50 for each day that Cannon was incarcerated plus an additional $50. At the beginning of the hearing, Hoover asked Cannon, "[Y]ou've learned your lesson about being a deadbeat?" Cannon replied, "Yes, sir." Hoover then stated, "When you don't take my orders, what happens, I put you in an orange suit and say just sit there and look at the walls." Hoover continued this discussion with Cannon, discussing how the hours in jail go by very slowly, and later following with the question, "How come you don't do what you're supposed to do?" Cannon expressed a variety of hardships, including the death of his son and the possibility of losing his house, but overall, he took responsibility for not appearing in court.

{¶ 62} After a discussion with Cannon about how long he had been in jail, Hoover agreed to release him and credit him $250 toward the fines and costs he owed. However, Hoover expressed that Cannon would need to pay the balance within 30 days "or we're gonna be talkin' orange again." The journal entry confirmed that Cannon was released, credited with $250, and ordered to pay the balance within 30 days.

{¶ 63} Disciplinary counsel charged Hoover with violations of Jud.Cond.R. 1.2, 2.2, and 2.3(B) and Prof.Cond.R. 8.4(d). Hoover stipulated to a violation of Jud.Cond.R. 2.2. The board found that the other violations were supported by sufficient evidence.

{¶ 64} Hoover objects to the board's findings that he committed the remaining violations. He alleges that a "true clerical error resulted in a bad result" and that it was "never his intent" to send Cannon to jail. Disciplinary counsel responds that Hoover's actions were more than a simple mistake, emphasizing that Hoover had referred to Cannon as a "deadbeat" and threatened to jail him again if he did not pay the balance of his fines and costs within 30 days.

**{¶ 65}** We agree with the board's findings that all four violations were supported by sufficient evidence. As we recognized above, a judge who makes an error of law in good faith or commits "'a mere mistake in the exercise of judicial discretion'" is not and should not be subject to disciplinary proceedings under the Code of Judicial Conduct. *Gaul*, 2023-Ohio-4751, at ¶ 44, quoting *Franko*, 168 Ohio St. at 30. But once again, Hoover's actions went beyond a simple mistake. Hoover threatened Cannon with jail time on a nonjailable offense if he did not pay his fines and costs immediately, though at his disciplinary hearing, Hoover characterized his statements as "[e]ncouraging" Cannon to pay and insisted that he "had not planned on putting him in jail." Nonetheless, Hoover ignored R.C. 2947.14 by failing to inform Cannon of his right to counsel, failing to hold an ability-to-pay hearing, and failing to segregate the costs from the fines, *see Swift*, 2005-Ohio-1599, at ¶ 29. In failing to segregate the costs from the fine, Hoover violated the Ohio Constitution by incarcerating Cannon for not paying his costs, *see Strattman*, 20 Ohio St.2d at 102-103; Ohio Const., art. I, § 15. Hoover told Cannon that he would be going to jail again if he did not pay *the balance* by the stated date. While Hoover maintained that this was an honest mistake that he discovered following discussions with his bailiff, Hoover fully admitted that he does not follow R.C. 2947.14, because the statute does not work effectively for him.

**{¶ 66}** But even if the original jailing had been an honest mistake, Hoover's actions after discovering that mistake were prejudicial to the administration of justice. During his disciplinary hearing, Hoover testified that when Cannon reappeared before him after spending four days in jail, he was alerted to the fact that his bailiff had "screwed up" and that Cannon should never have been incarcerated in the first place. Yet even after discovering that Cannon had been unlawfully jailed, Hoover did not back down from his position that Cannon would be jailed again if he failed to pay his remaining balance because, Hoover explained, he "generally tr[ies] not to admit liability that's going to get us sued." This type of

22

behavior—ignoring the application of a statute and failing to admit when the court has unlawfully deprived a person of his liberty—fails to promote public confidence in the integrity of the judiciary and is prejudicial to the administration of justice. Therefore, we agree that Hoover violated Jud.Cond.R. 1.2 and 2.2 and Prof.Cond.R. 8.4(d).

{¶ 67} Making matters worse, Hoover suggested that Cannon was a "deadbeat" after he failed to pay his fines and court costs. At his disciplinary hearing, Hoover attempted to justify his comment by claiming that he has "got names for anybody that irritates me probably," despite acknowledging that such language is "[n]ot particularly respectful." This type of rhetoric amounts to a violation of Jud.Cond.R. 2.3(B) by showing a bias or prejudice toward Cannon based on his socioeconomic status, and such rhetoric and threats of incarceration are problematic to the wheels of justice. *See Porzio*, 2020-Ohio-1569, at ¶ 9; Jud.Cond.R. 2.3, Comment 2.

{¶ 68} Therefore, we agree and adopt the findings of the board that Hoover committed violations of Jud.Cond.R. 1.2, 2.2, and 2.3(B) and Prof.Cond.R. 8.4(d).

### E. Count 5: the Ridenour Matter

{¶ 69} In January 2021, Luke Ridenour was charged with a first-degree-misdemeanor drug offense after he had overdosed in his home. Ridenour appeared before Hoover for arraignment, without counsel, and was advised of the potential penalties, including a $1,000 fine and up to six months in jail. Ridenour then pleaded guilty after being told by Hoover that he could not plead no contest. Hoover did not inform Ridenour of his right to counsel and instead directed him to "sign a rights form" after he entered his plea.

{¶ 70} Hoover then asked Ridenour about the situation, and Ridenour explained that he had relapsed but was going to try to get clean and resume working. Hoover explained, "I don't put people in jail for this kind of stuff, Luke. I mean, you're gonna kill yourself, of course. If you wanna kill yourself, that's your

business. At the same time, the police gotta get involved, then it becomes my business." Hoover then explained that because Ridenour was charged with a first-degree misdemeanor due to his prior drug convictions, Hoover had to fine him $750.

{¶ 71} Hoover followed with, "How long do you gotta work to make $750 plus court costs?" Ridenour estimated that it would take him about a month, if his entire paycheck went to fines and costs. But after discussing with Hoover the total amount, which Hoover said would likely exceed $1,000, Ridenour estimated that it would take six to nine months to pay the fine and costs. Hoover responded, "Geez, well, I am not giving you six to nine months to pay this off. . . . If you've got money for heroin, you got money for fines and costs [and] you better start calling people [and] raise enough money." Hoover then fined Ridenour $750 and sentenced him to serve 30 days in jail but suspended the jail sentence provided that Ridenour paid his fines and costs.

{¶ 72} Hoover then told Ridenour, "You're going to start making some telephone calls to raise money, I guess. How much you got with you now?" Ridenour explained that he did not have any money with him but that he had $45 at home. Hoover exclaimed, "Oooh. That's not good." Hoover then proceeded to order Ridenour to pay the fine "now," and told Ridenour that he would need to "start calling mom and dad and grandma and ask them for birthday presents early." Hoover stated that he would write "pay today" but if Ridenour "could come up with a substantial amount," Hoover would give him some leniency. Hoover wrote, "Pay today" on the journal entry.

{¶ 73} Ridenour went to the clerk of courts to get the total amount owed and contact his family. At Hoover's disciplinary hearing, the clerk of courts testified that based on subsequent discussions she had with her employees and the Ridenour family, she believed that Ridenour "was being kept and his jail sentence was contingent upon his mother paying." Further, she was told that Ridenour "was

crying in the lobby. And there was bartering back and forth between the Bailiffs as to exactly how much money was going to be acceptable for him to get out." Ridenour was able to secure $500 after contacting his family. The bailiff informed Hoover, who agreed to release Ridenour after a few hours. Hoover crossed out the original note of "Pay today," and wrote "Pay $500 today."

{¶ 74} Disciplinary counsel charged Hoover with violations of Jud.Cond.R. 1.2, 2.2, and 2.3(B) and Prof.Cond.R. 8.4(d). At his disciplinary hearing, Hoover offered a rationale for these actions, maintaining that he sentenced Ridenour because he was "giving him a way out" by either taking "his heroin money" or putting him in jail to "keep[] him away from heroin." And in his posthearing brief, Hoover claimed that "judicial discretion of this type is exercised across the state" and "at this juncture, the law in Ohio does not label such an order inappropriate." The board found that Hoover committed all four violations. We agree.

{¶ 75} Ridenour was charged with a first-degree-misdemeanor offense that was punishable by up to six months in jail and a fine of up to $1,000, *see* R.C. 2929.24(A)(1) and 2929.28(A)(2)(a)(i). This means that Ridenour could not have been sentenced to a term of confinement "unless after being fully advised by the court," he "knowingly, intelligently, and voluntarily waive[d] assignment of counsel." Crim.R. 44(B); *see also State v. Brooke*, 2007-Ohio-1533, ¶ 20, citing Crim.R. 44(B). At Hoover's disciplinary hearing, Ridenour testified that he had signed a waiver of rights, but that he did not read that waiver before signing it, nor did Hoover explain the waiver to him. Ridenour also testified that he had asked to plead no contest because he did not understand the situation, and he explained that he had not fully read the waiver because he "felt kind of rushed" and was "scared." Without the waiver, Ridenour would never have had a period of incarceration hanging over his head at that hearing. *See Brooke* at ¶ 20; Crim.R. 44(B).

{¶ 76} Hoover fined Ridenour $750 and sentenced him to serve 30 days in jail, but he suspended the jail term provided that Ridenour pay his fines and costs.

While Hoover could have required that Ridenour be committed to jail until he paid the fine under R.C. 2947.14(A), Ridenour had a right to be represented by counsel and present evidence as to his ability to pay the fine. R.C. 2947.14(B). However, Ridenour was never provided that opportunity. Hoover had Ridenour held in custody for hours, threatened to jail him for his inability to pay fines and costs, failed to provide him due-process protections, did not segregate fines from costs, and did not credit Ridenour with $50 toward his fine for the time he was in custody. Hoover's actions demonstrate a willful failure to follow the law. Therefore, the record supports a finding that he violated Jud.Cond.R. 1.2 and 2.2 and Prof.Cond.R. 8.4(d).

**{¶ 77}** Additionally, Hoover violated Jud.Cond.R. 2.3(B) by engaging in conduct that demonstrated a bias or prejudice against Ridenour based on his socioeconomic status. Hoover engaged in insensitive questioning and commentary concerning Ridenour's financial status and drug use. Ridenour told the hearing panel that he felt humiliated and believed that he was being punished for his financial status since Hoover had not ordered him to jail based on the drug offense. The clerk of courts verified Ridenour's belief, explaining that she had had conversations with Ridenour's family and her employees about the bartering that went on between the bailiffs on exactly how much money Ridenour or his family would have to pay to get him released from custody. And Hoover engaged in this behavior knowing that it was likely that Ridenour's mother would ultimately pay the fine. We agree with the board's findings and its conclusion that "[j]ustice cannot be conditioned on a defendant's, or his family's, ability to pay."

**{¶ 78}** Therefore, we find that Hoover committed all four charged violations.

### F. Count 6: the Riddle Matter

**{¶ 79}** In October 2018, Phyllis Riddle was arrested and charged with two counts of driving under suspension, both unclassified misdemeanors, and one count

of driving with expired tags, a minor misdemeanor. At Riddle's pretrial hearing two weeks later, Hoover noted that all of the charges were nonjailable offenses but that he could impose a fine of up to $1,000. Appearing without counsel, Riddle entered a plea of guilty to one of the driving-under-suspension offenses, and the other two charges were dismissed. Thereafter, Hoover imposed a $200 fine and court costs. He noted that Riddle would need to pay her fines and costs within 30 days or return to court.

{¶ 80} Riddle failed to pay her fines and costs within 30 days and did not appear at her scheduled hearing. Hoover then issued a warrant for her arrest and wrote on the corresponding journal entry that Riddle failed to appear, that the court had issued a bench warrant, and that bail would be set at "$5,000/10% or surety."

{¶ 81} Riddle was arrested over nine months later on the outstanding warrant. A family member posted Riddle's bail, and Riddle appeared in court a few days later. The following exchange then occurred between Hoover and Riddle:

Hoover: Phyllis, you've been hiding from me. You didn't come back, you didn't do anything. So here's the bad news. It looks like whoever posted the bond for you says you can't use it for fines and costs. So, now it's time to pay the piper. What it means is that you now have to pay fines and costs or you don't go home. And, it says you owe $664.40 'cause you got the extra charges with it going to the Attorney General. If you go to jail, you get credit for $50 a day. That means that you'd be in there for approximately two weeks. You gonna be able to come up with any or all of it to shorten your time?

Riddle: Mmmm. I just lost my job. And, no.

Hoover: Okay.

Riddle: I have a child. Right.

Hoover: You haven't done what you were supposed to do. All we said was either pay it or come back and talk to us. You didn't do either. Because of that, now we don't talk anymore.

{¶ 82} Hoover, after finding out that Riddle's mother had posted her bail, asked Riddle whether her mother would "step up" to pay the fines. Hoover then asked Riddle why she had not returned to court. She claimed that her failure to appear was not deliberate. Hoover emphasized that the order stated that she was to appear if the fines and costs were not paid and that he had given her a "month to try to come up with something." Hoover then prepared an entry to remand Riddle to jail and release her once she paid her fines and costs in full, with Riddle receiving credit in the amount of $50 for each day served. Riddle, while still in custody, was able to pay her outstanding fines and costs, totaling $664.40, and she was released that same day.

{¶ 83} Disciplinary counsel charged Hoover with violations of Jud.Cond.R. 1.2, 2.2, and 2.3(B) and Prof.Cond.R. 8.4(d). During his disciplinary hearing, Hoover admitted that he had threatened to put Riddle in jail and that that was the reason she paid her fines and costs. Hoover justified this behavior based on his familiarity with Riddle and his belief that she had the money to avoid being incarcerated. Hoover characterized Riddle's being held in custody until she could pay her fines and costs as "being inconvenienced."

{¶ 84} In its report, the board found that the only distinguishing factor between the Dawson and Cannon matters and Riddle's case was that Riddle was able to come up with the money owed *before* she was transferred to jail. The board concluded that Hoover violated Jud.Cond.R. 1.2 and 2.2 and Prof.Cond.R. 8.4.(d).

{¶ 85} Hoover objects to the board's findings because, he claims, he did not "jail" Riddle. However, Hoover admitted that Riddle was "not free to leave" and was "being held" for nonpayment of fines and costs even though she had been

convicted of a nonjailable offense. Riddle was arrested for failing to show up to court to discuss why she had failed to pay her fines and costs on a nonjailable offense, and she was not permitted to leave the courthouse without payment; the fact that she had not yet been transferred to jail is a distinction without a difference. *See* R.C. 2947.14(A) through (C). Hoover deprived Riddle of her liberty without due process to coerce the payment of a fine and court costs. We agree with the board that Hoover used the same improper threats of incarceration to compel Riddle to pay her fines and court costs as those that he used against Dawson and Cannon and thereby violated Jud.Cond.R. 1.2 and 2.2 and Prof.Cond.R. 8.4(d).

{¶ 86} As for the alleged violation of Jud.Cond.R. 2.3(B), the board found that Hoover engaged in conduct that demonstrated bias and prejudice against Riddle due to her socioeconomic status. The board noted that Hoover had acknowledged his belief that if pressured, Riddle would pay. And during his disciplinary hearing, Hoover even boasted that this was how he had coerced Riddle to pay her fines and costs in past cases, at least five other times. Hoover knew that it was improper to threaten and then hold Riddle on a nonjailable offense in order to compel her to pay her fines and costs. The board found that Hoover's behavior toward Riddle demonstrates the following: "if a defendant has money to pay, she walks out of the courthouse; if not, she goes to jail." We agree with the board that Hoover's actions demonstrate an indifference toward poor defendants, which in turn prejudices them based on socioeconomic status. Such behavior violates Jud.Cond.R. 2.3(B).

{¶ 87} Therefore, we adopt the board's findings that Hoover violated Jud.Cond.R. 1.2, 2.2, and 2.3(B) and Prof.Cond.R. 8.4(d).

### G. Count 7: the Mitchell Matter

{¶ 88} In June 2020, Erica Mitchell was cited for driving under suspension, an unclassified misdemeanor and a nonjailable offense. The following week, Mitchell failed to appear for her arraignment, and a warrant was issued for her arrest. Mitchell was eventually arrested and arraigned without counsel.

**{¶ 89}** Hoover began the proceeding by noting that Mitchell was charged with a nonjailable offense unless she failed to appear. Again, Hoover noted that Mitchell's charge was not punishable with jail time and asked her how she would plead. Mitchell, without counsel, pleaded guilty.

**{¶ 90}** Hoover then questioned Mitchell about her failure to appear. Mitchell explained that her grandmother had passed away and that she had missed a lot of things during that time. Hoover responded, "All right here's the problem. I fine you a hundred dollars, I don't want you in jail, but I don't trust you to pay now." Mitchell explained that she could pay the fine, but "not right this second." Hoover answered, "Yeah, I was thinkin' I was just gonna keep you in jail until you could pay it. That way I'd know for sure." Mitchell asked, "a hundred dollars?," and Hoover explained that it would be a $100 fine plus court costs, which would be several hundred dollars more. Hoover explained that Mitchell had accrued some court costs by missing court and having a warrant issued for her arrest. Hoover then asked Mitchell, "[W]hat could you come up with now [so that] I'd have the excuse to let you out?" Mitchell replied that she could pay "about $100 today." Hoover agreed that if Mitchell could come up with $100, then she would be released, and he would then give her 30 days to pay the balance. Mitchell explained that she received $189 per week in unemployment benefits. Hoover responded that she would be released upon payment of $100 and ordered Mitchell to pay the balance within 30 days. Mitchell paid the $100 and was released later that day.

**{¶ 91}** Disciplinary counsel charged Hoover with violations of Jud.Cond.R. 1.2, 2.2, and 2.3(B) and Prof.Cond.R. 8.4(d), and the board determined that Hoover had violated all four rules.

**{¶ 92}** Hoover objects to the violations because, he claims, he was responding to Mitchell's irresponsible behavior and his actions in her case were a direct result of her failure to appear for her arraignment. Hoover argues that by

requiring Mitchell to pay her $100 fine before her release, he was just trying to hold her accountable. This argument lacks merit.

{¶ 93} Again, Hoover's failure to segregate costs from fines creates a significant issue with how he attempted to collect fines and costs. Hoover did not conduct an ability-to-pay hearing, did not advise Mitchell of her due-process rights, and did not otherwise comply with R.C. 2947.14. Hoover continued to threaten Mitchell with incarceration, even after his discussion with her established that she was receiving unemployment and on a fixed income. We agree with the board that Hoover's conduct violated Jud.Cond.R. 1.2 and 2.2 and Prof.Cond.R. 8.4(d).

{¶ 94} With respect to Jud.Cond.R. 2.3(B), the board found that in addition to demonstrating bias against Mitchell based on her socioeconomic status, Hoover demonstrated a bias against Mitchell based on her race by using "coercion and racial undertones in his speech." In a posthearing brief to the board, disciplinary counsel, citing to the stipulated transcript, alleged that "[i]n this particular instance, aside from treating Mitchell differently due to her socioeconomic status, [Hoover] demeaned Mitchell by speaking with racial undertones—"'*I's* thinkin' *I's* just gonna keep ya in jail 'til you could pay it.' " (Emphasis added by disciplinary counsel.) However, when listening to the audio recording of Mitchell's hearing, reading the hearing transcript of the audio from the disciplinary hearing, and reading the stipulated transcript, we note that there are inconsistencies. While the stipulated transcription reflects the use of a dialect that could be considered racial stereotyping, the audio recording of Mitchell's hearing and the disciplinary-hearing transcript indicate that Hoover used the same informal speech throughout his interaction with Mitchell as he did with each of the other 15 defendants in relator's complaint, some of whom are identified in the record as Black and some of whom are identified in the record as White. Therefore, we find that the board's finding of a violation of Jud.Cond.R. 2.3(B) based on racial undertones is not supported by this record.

{¶ 95} Nonetheless, the evidence still supports a violation under Jud.Cond.R. 2.3(B) based on socioeconomic status. Hoover threatened to incarcerate Mitchell, who was receiving unemployment benefits and living on a fixed income, when there was no legal basis for her incarceration. During his disciplinary hearing, Hoover described these actions as "merciful" rather than coercive. But there is nothing merciful about threatening to jail a defendant for a nonjailable offense simply because the defendant is unable to pay a fine at that very moment. If Mitchell had been financially stable, it is unlikely that she would have been subjected to this tactic. Thus, while we cannot agree with the board that Hoover's actions were racially biased, we do conclude that Hoover manifested bias against Mitchell based on her socioeconomic status.

{¶ 96} Therefore, we agree with the board that Hoover violated Jud.Cond.R. 1.2, 2.2., and 2.3(B) and Prof.Cond.R. 8.4(d).

## H. Count 8: the Miller Matter

{¶ 97} In November 2018, Naima Miller was charged with driving under suspension, an unclassified misdemeanor, and speeding, a minor misdemeanor—both of which were nonjailable offenses. Miller failed to appear for her arraignment, and the court issued a warrant for her arrest. Miller was apprehended on the warrant in January 2021, and she appeared before Hoover without counsel.

{¶ 98} Hoover called Miller's case and said, "Where you been child? We've been looking for you for two years." Miller responded, "Working. I be workin'." Hoover asked, "You've been workin' round the clock for more than two years?" Miller explained that she had been working 12-hour shifts.

{¶ 99} Hoover explained the charges to Miller and noted that they were "not the kind of charges [he] put people in jail for" and that he could fine Miller up to $1,000 for driving under suspension and $150 for speeding. Miller said that she understood and pleaded guilty. Hoover then fined Miller $100 for driving under

suspension, $25 for speeding, and assessed the court costs associated with each offense.

{¶ 100} After fining Miller, Hoover said, "Now tell me you got money. 'Cause this isn't something where after two years I can give you time to pay." Miller responded affirmatively, and Hoover said, "So what happens is they'll figure out what you owe, you gotta pay it. . . . We get that done, they'll cut you loose, get you outta that beautiful orange suit."

{¶ 101} Hoover wrote on the sentencing entry, "Pay today." And on the commitment paper, it stated, "TO PAY $512 BEFORE RELASE [sic]," representing the sum of Miller's fines and costs. Miller paid the total amount that day and was released.

{¶ 102} Disciplinary counsel charged Hoover with violations of Jud.Cond.R. 1.2, 2.2, and 2.3(B) and Prof.Cond.R. 8.4(d), and the board determined that Hoover had violated all four rules. In his objections to the board's report, Hoover argues that his actions in this matter are not cause for findings of the four violations. He maintains that he issued a fine and costs to be paid the same day because Miller had failed to come to court on a previous occasion. We are not convinced.

{¶ 103} Hoover did not make a good-faith effort to follow the law, namely, R.C. 2947.14. Hoover told Miller that she would not be released from custody until she paid her fines and costs, despite the fact that she had been convicted of nonjailable offenses. As with the defendants discussed above, Hoover did not conduct an ability-to-pay hearing, did not advise Miller of her due-process rights, and did not segregate the fines from the costs. Hoover's conduct supports a finding that he violated Jud.Cond.R. 1.2 and 2.2 and Prof.Cond.R. 8.4(d).

{¶ 104} Hoover also used demeaning and paternalistic language with racial undertones by referring to Miller, an adult Black woman, as "child" at the beginning of the hearing. While we acknowledge that Hoover has generally spoken in a very

familiar and informal manner to the defendants who come before him, such commentary in Miller's case supports a violation of Jud.Cond.R. 2.3(B). *See Gaul*, 2023-Ohio-4751, at ¶ 23-25 (judge's "demeaning use of the word 'brother' " when referring to a Black defendant appearing before him supported a violation of Jud.Cond.R. 2.3(B)).

{¶ 105} Therefore, we find that Hoover committed violations of Jud.Cond.R. 1.2, 2.2., and 2.3(B) and Prof.Cond.R. 8.4(d).

## I. Count 9: the Cesaratto Matter

{¶ 106} On May 26, 2015, Anthony Cesaratto entered guilty pleas, without counsel, in three separate matters in the Stow Municipal Court. The offenses included two first-degree misdemeanors for driving under suspension. Hoover sentenced Cesaratto to serve ten days in jail and pay $450 in fines. However, on the sentencing entry, Hoover ordered, "Release on payment in full or return to court on 5/29/15 @ 8:30am." Per the terms of the order, Cesaratto would not have had to serve any jail time had he been able to pay his fines and costs; but because he could not pay, he remained in jail until May 29, 2015, when he was returned to court. Hoover ordered Cesaratto's release but required him to return to court on June 19, 2015, if he had not fully paid his fines and costs. Cesaratto failed to pay and did not return to court; Hoover issued a warrant for his arrest.

{¶ 107} Five years later, Cesaratto was arrested on the outstanding warrant, although no further charges were pending. Hoover began Cesaratto's hearing by stating, "Anthony, now you just haven't cooperated with us very much. . . . There's three different cases and you owe like twelve-hundred bucks and you haven't done anything." Hoover asked why he should not just keep Cesaratto in jail and credit him with $50 per day and let him "stay there a month." Cesaratto explained that he could get the fine paid. Hoover responded, "I am not interested in the future, what do you got right now to pay?" Cesaratto said that he had a "couple hundred" dollars, and Hoover responded, "You stay. I'm not playing with you for ten years."

{¶ 108} Cesaratto told Hoover that he had bills to pay, but Hoover responded that everyone has bills. Hoover then asked whether Cesaratto wanted to make calls to see if anyone would lend him money to pay his fines and costs. Cesaratto said, "[N]o." Hoover ordered that Cesaratto be held in custody, giving him $50 credit for each day, until he paid his fines and costs in full; but Hoover's order also directed that Cesaratto be returned to court three days later. Cesaratto failed to pay, so he remained in custody until he was returned to court per Hoover's order.

{¶ 109} Hoover began, "Cesarrato, get on up here. You fool." Hoover explained that if Cesarrato had "behaved [himself]," Hoover would have let him go after his last appearance. Hoover observed that Cesaratto had been "passing gas, and laughing, banging on the door acting the fool." Hoover asked, "What the hell's wrong with you?" Cesaratto attempted to explain that his disruptive behavior had been the product of annoyance and boredom. Hoover scolded him, but eventually turned Cesaratto's behavior into a joke to lighten the mood.

{¶ 110} Hoover then turned the conversation to fines and costs that Cesaratto still owed on the previous convictions. Hoover noted that Cesaratto had paid most of his fines and costs back in 2015, but the clerk's office had miscalculated the total amount due and Cesaratto still owed more than $600. Hoover expressed that while the clerk's office had made a mistake, it did not matter. Hoover asked, "What are we gonna do about that?" Cesaratto asked for a couple of weeks to pay off the remaining balance, but Hoover pointed out that Cesaratto had already had five years to pay it off. Hoover decided to give Cesaratto $100 credit for the two days that he believed Cesaratto had served.

{¶ 111} Hoover explained to his bailiff that it was essentially the "the five-year anniversary" of Cesaratto's order to pay, and he concluded that "we've still made no progress." Hoover then began educating Cesaratto on the Juneteenth

holiday, given that it was June 19, and told Cesaratto that he had "the attention span of a gnat" when he did not know the purpose behind the holiday.

{¶ 112} Hoover then discussed with Cesaratto when he thought he could pay the remaining balance. When Cesaratto stated that he could probably pay it off within a few weeks, Hoover asked Cesaratto, "What happens if you haven't paid this off by July 10?" Cesaratto responded, "Go to jail."

{¶ 113} Hoover ordered Cesaratto to pay the remaining balance within four weeks, after discussing Cesaratto's employment situation. Hoover released Cesaratto, but credited him with only $100 toward his fines and costs despite Cesaratto's having spent four days in custody.

{¶ 114} Disciplinary counsel charged Hoover with violations of Jud.Cond.R. 1.2, 2.2, and 2.3(B) and Prof.Cond.R. 8.4(d). When questioned at his disciplinary hearing about his treatment of Cesaratto, Hoover responded, "I did not put him in jail for failing to pay. I put him in jail for not coming back, not showing responsibility. . . . I just want[ed] to wake him up." The board found that Hoover committed the four violations.

{¶ 115} Hoover objects to the board's report because, he claims, he ordered Cesaratto to serve time on his "previously issued" sentence. Hoover also continues to maintain that he did not put Cesaratto in jail for failing to pay fines and costs but rather, for failing to appear and not showing responsibility. We agree with the board's findings. While Hoover could have lawfully incarcerated Cesaratto for the remaining portion of his original ten-day sentence, he did not do so. This is borne out by Hoover's statements at the June 16 and June 19, 2020 hearings and in the corresponding journal entries. *See Leegrand*, 2022-Ohio-3623, at ¶ 8 (a court speaks only through its journal).

{¶ 116} If Hoover was going to incarcerate Cesaratto for failing to pay his fines, then he needed to comply with R.C. 2947.14. But Hoover did not segregate the fines from costs, did not protect Cesaratto's due-process rights, and did not give

him adequate credit for the time that he had served.  And even though Cesaratto had paid most of the fines and costs, Hoover threatened to jail him again if he did not pay the balance within four weeks.

{¶ 117} Furthermore, Hoover called Cesaratto a "fool" and told him that he had the "attention span of a gnat."  Judges are held to the "highest standards of professional behavior."  *Carr*, 2022-Ohio-3633, at ¶ 86, citing *Disciplinary Counsel v. O'Neill*, 2004-Ohio-4704, ¶ 57. While Cessaratto's behavior in the courthouse may have been disruptive, that did not relieve Hoover from his duty to treat Cessaratto with "patience, courtesy, and dignity" and to "exercise fair and impartial judgment," *Gaul*, 2023-Ohio-4751, at ¶ 56. Hoover plainly did not meet these standards.

{¶ 118} Through his treatment of Cesaratto, Hoover failed to act in a manner that promoted confidence in the judiciary, uphold the law impartially, and perform his duties without manifesting bias, prejudice, or harassment.  Hoover's conduct was also prejudicial to the administration of justice.  Therefore, we adopt the board's findings that Hoover violated Jud.Cond.R. 1.2, 2.2, and 2.3(B) and Prof.Cond.R. 8.4(d).

**J.  Count 10: the Juersivich Matter**

{¶ 119} On May 19, 2020, Michael Juersivich Jr. was arrested and charged with theft, a first-degree misdemeanor.  The following day, Juersivich appeared before Hoover, without counsel, for arraignment.  Hoover began, "Michael, good God man, it looks like it's been a hard night."  Hoover informed Juersivich that he had an old case and a new case, with the theft charge carrying a penalty of up to six months in jail and a $1,000 fine.  Juersivich then pleaded guilty to the theft charge.

{¶ 120} Hoover noticed that Juersivich still owed $751.30 in fines and costs on an older case.  Juersivich said that he would be able to pay back that amount if the court placed him on a payment plan.  Juersivich explained that he was disabled and had schizophrenia.  Hoover responded, "I couldn't understand you. You've

gotta talk like a man." Juersivich reiterated that he was "on disability" for schizophrenia and did not have a lot of money. Juersivich explained that he had a case manager who could help him with a payment plan.

{¶ 121} Hoover told Juersivich that he could not let him out of jail because he "didn't listen" the last time—Hoover said that he had previously released Juersivich from jail on the condition that he would "take care of things within 30 days or come back to court." Juersivich explained that he thought his sister had taken care of the fines and costs in his first case. Hoover responded, "If someone comes in and takes care of it for you, I'll cut you loose, but right now you're untrustworthy."

{¶ 122} Juersivich asked how long Hoover was going to put him in jail, to which Hoover responded, "[T]en days." Hoover then explained to Juersivich, "[T]hey'll release you if you pay in full. If you haven't, they're going to hold on to you, at least for five days. . . . After five days, I'm going to tell them to let you loose, and then you've got 30 days to pay." Juersivich was sentenced to ten days in jail, with five days suspended, and a $250 fine. Hoover wrote on the sentencing entry, "Release upon payment in full or 5-24-20, then [to pay] 30 days."

{¶ 123} Juersivich did not pay his fines and costs on either case; consequently, he served five days in jail. Had he been able to pay, Juersivich would not have had to serve any jail time.

{¶ 124} Disciplinary counsel charged Hoover with violations of Jud.Cond.R. 1.2, 2.2, and 2.3(B) and Prof.Cond.R. 8.4(d). The board found that Hoover had violated all four rules. Here, Hoover objects to the board's findings based on his assertion that he exercised his discretion in sentencing Juersivich to either serve time in jail or pay a fine. Hoover claims that this is a common tactic used by other courts in Ohio, and he has cited a few examples in a footnote in his objections.

**{¶ 125}** Hoover is correct that he could have imposed jail time or a fine. *See* R.C. 2929.24(A)(1); R.C. 2929.25(A)(1)(b); R.C. 2929.28(A)(2)(a)(i). But a jail sentence is appropriate only when a defendant has knowingly, intelligently, and voluntarily waived his right to counsel. *See Brooke*, 2007-Ohio-1533, at ¶ 20; Crim.R. 44(B). Here, Juersivich was not appointed counsel or told that he could have counsel, and instead, he simply pleaded guilty. Additionally, Juersivich explained that he was schizophrenic and receiving disability for that mental illness. Thus, without a waiver of counsel—of which there is no evidence in this record—Hoover could not sentence Juersivich to jail time. *See Brooke* at ¶ 20; Crim.R. 44(B).

**{¶ 126}** But assuming arguendo that the sentence was permissible, Hoover relied on the fines and costs from Juersivich's previous case in determining whether he would sentence Juersivich to serve time in jail or release him. During his disciplinary hearing, Hoover admitted that "[b]ecause the old case still existed, I put him in jail on the new case." The board found that "[i]n doing so, the protections of R.C. 2947.14 should have been triggered." We agree—the procedural safeguards of R.C. 2947.14 should have been followed.

**{¶ 127}** Hoover failed to separate the fines and costs, and he should have afforded Juersivich his due-process rights and conducted an ability-to-pay hearing. Hoover's failure to do so is even more egregious because Juersivich explained that he was receiving disability benefits for schizophrenia, was poor, and was not represented by counsel. And Hoover admitted that if Juersivich had had the money to pay the fines and costs, he would have "cut [him] loose."

**{¶ 128}** Again, Hoover's conduct supports findings that he failed to promote public confidence in the independence, integrity, and impartiality of the judiciary, *see* Jud.Cond.R. 1.2, failed to perform all duties of his office fairly and impartially, *see* Jud.Cond.R. 2.2, and engaged in conduct prejudicial to the administration of justice, *see* Prof.Cond.R. 8.4(d). Additionally, Hoover's conduct

supports a finding that he performed his duties with bias or prejudice toward Juersivich based on his socioeconomic status, *see* Jud.Cond.R. 2.3(B). Therefore, we adopt the board's findings and conclude that Hoover committed all four charged violations.

### K. Count 11: the Williams Matter

{¶ 129} In September 2007, Glen Williams was charged with driving under suspension, a first-degree misdemeanor, and a taillight/license-plate-light violation, a minor misdemeanor. After failing to appear for his arraignment, a bench warrant was issued for Williams's arrest. The next year, he was arrested on the outstanding warrant but again failed to appear for his arraignment, and a second warrant was issued for Williams's arrest.

{¶ 130} Williams was arrested in May 2020, and he appeared before Hoover, without counsel, for arraignment on the 2007 offenses. Hoover began, "Oh man. You've been dancing this thing around for 13 years?" Williams explained certain hardships that he had experienced, and he told Hoover that he was now trying to take care of the issues involving his license so that he could resume working, since his employment in downtown Cleveland—which he could get to using public transportation—had ended. Hoover found Williams guilty of both offenses and told him that "when I sentence you . . . I'm gonna order you to make sure you pay all fines and costs before you are released, because I'm not gonna go looking for you ever again."

{¶ 131} Hoover explained that if Williams did not have the money to pay the fines and costs that day, then he would not be released. Hoover informed Williams that it was going to be a lot of money given that Williams had several warrants issued for his arrest. Hoover fined Williams $100 for driving under suspension and $10 for the taillight/license-plate-light violation, in addition to costs. Hoover told Williams that he did not want to put Williams in jail but emphasized that "fines and costs must be paid before your release, and if they are

not paid, then you will serve 20 days in jail." Hoover told Williams that the clerk's office would figure out what he owed and if he could pay it that day, then he would be released; however, if Williams could not pay it, then he would be placed in custody and would be brought before the court in three weeks. Williams paid $629 in fines and costs that day and was released without serving any jail time.

{¶ 132} Disciplinary counsel charged Hoover with violations of Jud.Cond.R. 1.2, 2.2, and 2.3(B) and Prof.Cond.R. 8.4(d), and the board found that he had violated all four rules. In his objections to the board's findings of misconduct, Hoover contends that the violations are not supported in this matter because he sentenced Williams lawfully by imposing a 20-day suspended jail term and ordering that he be released if he paid his fines and costs that day. We agree with the board.

{¶ 133} At his disciplinary hearing, Hoover testified that he was giving Williams "choices," and he explained his rationale: "I'm going to punish you either with a fine and jail, just a fine, and if you can't pay anything, I might just use jail. In this case, I gave him an option. That option allowed him to do what was best for him. . . . [H]e had the money in his pocket and went downstairs and paid it in full."

{¶ 134} The board disagreed with Hoover and determined that R.C. 2947.14 was implicated, because Hoover threatened incarceration in order to coerce full payment on a 13-year-old case. We agree with that reasoning. At Hoover's disciplinary hearing, disciplinary counsel asked, "You told [Williams] you didn't want to put him in jail, so the real reason you put him in jail was to squeeze him to pay his fines and costs?" Hoover responded, "I'm going to teach him a lesson one way or the other." And Hoover's statements to Williams demonstrate that this approach was not about Williams having a choice concerning his punishment—Hoover plainly told Williams that he did not want to place him in jail but was *not* going to release him *unless* he paid his fines and costs that day. At his disciplinary hearing, Hoover explained that he was going to sentence Williams to jail not

because he deserved it for the offenses he was convicted of, but rather, because he could not "allow him to escape responsibility from 13 years before."

**{¶ 135}** Hoover coerced payment on a 13-year-old case by threatening Williams with 20 days in jail. Additionally, like in the other cases, Hoover did not segregate the fines from the costs, did not provide Williams with a hearing, and did not afford him procedural due process. We agree with the board that Hoover violated Jud.Cond.R. 1.2 and 2.2 and Prof.Cond.R. 8.4(d).

**{¶ 136}** As for Jud.Cond.R. 2.3(B), we agree with the board that Hoover's statement, "If you don't have any money, then it ain't gonna work out [for you] today," supports a finding of bias against Williams based on his socioeconomic status. Therefore, we agree with the board that Hoover also violated Jud.Cond.R. 2.3(B).

## L. Count 12: the Hudspath Matter

**{¶ 137}** In January 2020, Steven Hudspath was charged with theft, a first-degree misdemeanor. He failed to appear for his arraignment, and a warrant was issued for his arrest. Two weeks later, Hudspath was arrested on the warrant and appeared before Hoover, without counsel, the same day. Hoover informed him of the charge and explained that it was punishable by a fine of up to $1,000 and six months in jail. Hudspath pleaded guilty to the theft charge and waived his rights by signing a written form.

**{¶ 138}** Hoover asked Hudspath why he committed the crime, and Hudspath explained that he was "saving a dollar" by stealing two bottles of Coke from a convenience store. Hoover then noted that Hudspath had a lengthy criminal record and asked, "[A]ren't you getting a little old to be a petty thief?" Hudspeth responded, "Yes, sir." Hoover then quipped, "You enjoy time in jail, do ya?" He asked why Hudspath had not shown up for his arraignment, and Hudspath explained that he had wanted to attend a family gathering following his sister's death and

thought that if he showed up to court but could not pay the fine, he would be sent to jail and unable to attend the event.

**{¶ 139}** Hoover looked at Hudspath's record once again and noted that "thievery travels with you." When Hoover asked Hudspath how he supported himself, Hudspath told Hoover that he was employed as an equipment operator. Hoover, after describing Hudspath's crime, told Hudspath, "You ought to stay in jail. . . . You're just a thief. This isn't a mistake. This is a complete plot."

**{¶ 140}** Hoover sentenced Hudspath to serve ten days in jail and imposed a $250 fine, but he agreed to release Hudspath the following day if he paid all fines and costs by then. However, Hoover then explained that if Hudspath failed to pay by the next day, then he would remain in jail until Hoover was next available, which would be several days later. Hudspath said that he did not have the funds. Nevertheless, Hoover stated, "If there is no money coming, get comfortable. I'm gonna make you pay a price somehow, since you've done this over and over again." Hudspeth was able to pay his fine and costs the following day and was released from jail.

**{¶ 141}** Disciplinary counsel charged Hoover with violations of Jud.Cond.R. 1.2, 2.2, and 2.3(B) and Prof.Cond.R. 8.4(d). During his disciplinary hearing, Hoover maintained that R.C. 2947.14 was not implicated because Hudspath "was going to go to jail no matter what he did."

**{¶ 142}** R.C. 2947.14(A) allows a court to impose a fine as part of a sentence and to commit the offender to jail until the fine is paid, *if* the court determines at a hearing that the offender can pay the fine but refuses to do so. In its report, the board acknowledged that the sentence Hoover imposed on Hudspath was "ostensibly lawful," but it determined that the sentence "became problematic" when Hoover conditioned Hudspath's release on the payment of his fines and costs, thereby triggering R.C. 2947.14. The board found that Hoover had committed each of the charged rule violations.

{¶ 143} Hoover ordered Hudspath to serve only one day in jail and then be released if he paid his fine and costs, which Hudspath did. Hoover argues this was lawful. While incarcerating Hudspath may have been lawful, Hoover failed to segregate the fine from the costs, failed to hold an ability-to-pay hearing, and failed to appoint counsel, all while demeaning Hudspath throughout the proceedings. So, although Hoover's failure to follow R.C. 2947.14 would not likely violate Jud.Cond.R. 2.2 if the error were made in good faith, the record does not support such a finding here. Hoover never held an R.C. 2947.14 hearing and has admitted that he ignored the statute. His conduct constituted violations of Jud.Cond.R. 1.2 and 2.2 and Prof.Cond.R. 8.4(d).

{¶ 144} Furthermore, Hoover's name-calling and demeaning comments toward Hudspath, especially concerning his age and socioeconomic status, were improper. *See* Jud.Cond.R. 2.3(B), Comment 2. During oral argument before this court, Hoover's counsel argued that it was not improper to call Hudspath a thief because he was one. It is true that Hudspath admitted guilt and explained his crime, but Hoover made several demeaning comments concerning Hudspath's age. Jud.Cond.R. 2.3(B) prohibits judges from engaging in biased, prejudicial, or harassing conduct. Hoover's commentary was unnecessary and demonstrated a bias or prejudice toward Hudspath that constitutes a violation of Jud.Cond.R. 2.3(B).

{¶ 145} Therefore, we agree with the board that the record supports violations of Jud.Cond.R. 1.2, 2.2., and 2.3(B) and Prof.Cond.R. 8.4(d).

## M. Count 13: the Davis Matter

{¶ 146} In 2000, William Davis pleaded guilty in the Cuyahoga Falls Municipal Court[3] to one count of driving under suspension, a first-degree misdemeanor. The court sentenced him to serve 90 days of home incarceration,

---

3. Effective January 1, 2009, the Cuyahoga Falls Municipal Court was abolished and replaced by the Stow Municipal Court. *See* Am.Sub.S.B. No. 171, 151 Ohio Laws, Part II, 2084, 2126, 2131.

with 60 days suspended on conditions, and ordered him to pay a $1,000 fine, with $500 suspended, and $125 in court costs within 30 days. Davis failed to pay and therefore a warrant was issued for his arrest. Davis also failed to report for his home-incarceration installation. Eventually, Davis's delinquent fines and costs were sent to the Ohio Attorney General's Office for collections.

{¶ 147} Twenty-two years later, Davis was charged in the Stow Municipal Court with possession of drug paraphernalia, a minor misdemeanor, and three traffic offenses: driving under suspension, an unclassified misdemeanor; making an improper right turn, a minor misdemeanor; and expired or unlawful plates, a minor misdemeanor. He appeared before Hoover for his scheduled arraignment in February 2022.

{¶ 148} Hoover informed Davis that his 22-year-old case had not been paid. Davis explained that he had been in Florida. Hoover responded, "Man I hope Florida was good to you and you came home with a bank account. Because we're not leaving here with a 22-year-old case unresolved."

{¶ 149} Hoover then proceeded to talk about the new offenses, informing Davis of the charges and the potential fines that could be imposed for each offense. Davis pleaded not guilty to those charges. Davis then expressed that he did not have knowledge of the 22-year-old case and that he would have resolved it sooner if he had "had a recollection of it" while he was living in Florida. Hoover responded, "Well, we're going to take care of it today, or you're not going home." Davis tried to explain that he was planning to file his taxes that day, but Hoover responded, "No. It's 22 years old. . . . You then apparently took off."

{¶ 150} An exchange occurred between Davis and Hoover, during which Davis implored Hoover to work with him on paying the outstanding $792 in fines and costs, but Hoover told Davis his "promises mean nothing" and that he would get a $50 credit for each day he remained in jail. Hoover instructed Davis to make

telephone calls to get someone to pay the outstanding amount or else he would send Davis to jail.

{¶ 151} Hoover ordered Davis to a custodial program and noted on the journal entry that Davis had failed to complete the jail sentence imposed in 2000 and failed to pay what was due from that case. Hoover ordered Davis to serve 90 days and then be returned to court.

{¶ 152} Disciplinary counsel charged Hoover with violations of Jud.Cond.R. 1.2, 2.2, and 2.3(B) and Prof.Cond.R. 8.4(d). During his disciplinary hearing, Hoover maintained that R.C. 2947.14 was not implicated because Davis was ordered to serve time on his prior sentence.

{¶ 153} The board determined that Hoover had a lawful reason to incarcerate Davis but found that "the exchange between them made clear [the] fact that Davis would only be incarcerated if he could not pay his outstanding fines and costs" from his 2000 conviction. It was especially troubled by the fact that Davis "begged" Hoover to release him because he did not have the financial means to pay the outstanding fine and costs. Additionally, the board noted that Hoover had also failed to segregate fines and costs, failed to protect Davis's due-process rights, and failed to hold an ability-to-pay hearing.

{¶ 154} In his objections to the board's report, Hoover challenges the board's findings that he committed these violations, maintaining his claim that "R.C. 2947.14 was not implicated" in Davis's case, because Davis had already been sentenced to serve 30 days of home-incarceration when he took off in his prior case. Hoover is right that Davis could have been properly incarcerated for that sentence, but the rhetoric used against Davis concerning his finances was inappropriate. By telling Davis that he hoped "he came home with a bank account" in order to resolve the case by paying his fines and suggesting that Davis begin calling people to get them to pay his fines or else be sent to jail to serve his sentence, Hoover was coercive. Those comments also support the implication of R.C. 2947.14. Hoover's

conduct and failure to follow the proper procedures, like segregating fines from costs and informing Davis of his right to counsel, support the board's findings that he violated Jud.Cond.R. 1.2, 2.2, and 2.3(B) and Prof.Cond.R. 8.4(d).

### N.  Count 14: the Murray Matter

{¶ 155} In November 2017, Tarra Murray was charged with a second-degree-misdemeanor drug offense, with a maximum penalty of 90 days in jail and a $750 fine, and a fourth-degree-misdemeanor drug offense, with a maximum penalty of 30 days in jail and a $250 fine.  She pleaded guilty to both charges and was ordered to pay a $750 fine and $358 in court costs and serve 30 days in jail, with all time suspended on the condition that she return to court to pay her fines. She did not pay her fines and costs, so the matter was eventually sent to the attorney general's office for collections.  Murray was, however, credited with $351 toward her costs for payments she made after the matter was sent to collections.

{¶ 156} In 2021, Murray was charged with possession of drugs, a fifth-degree felony, and a drug-paraphernalia offense, a fourth-degree misdemeanor.  A warrant was issued for her arrest, and she was summoned to appear for arraignment in February 2022.  Murray appeared voluntarily for her scheduled arraignment before Hoover.

{¶ 157} Hoover noted that Murray had not paid her fines and costs from her 2017 case and then told her, "That makes it difficult for me to give you the bond your attorney is going to ask for because you're already showing yourself to be irresponsible."   Hoover asked how Murray supported herself, and she explained that she was not working but could go back to work once the warrant was cleared up.  Murray told Hoover that she could "pay something" on the fines that day.  A public defender then represented Murray for the rest of the bond hearing and expressed that Murray had some money she could put forth toward the amount due in the 2017 case.

{¶ 158} Hoover asked Murray, "What kind of money do you have to pay on your five-year-old drug convictions." Once Murray told Hoover she could pay it all off, Hoover responded, "That's a big difference then." Hoover expressed that he would consider a personal recognizance bond, but only if he knew that the remaining balance was paid. Murray again told Hoover that she could pay the amount due and explained that she would do so with her bank card.

{¶ 159} Hoover directed Murray to go make the payment and come back, at which point he would address bond on the new charges. Hoover told Murray that he was inclined to give her a "signature bond." Murray then paid $882.20 in satisfaction of her outstanding fines and costs from the 2017 case, and Hoover issued a personal-recognizance bond.

{¶ 160} Disciplinary counsel charged Hoover with violations of Jud.Cond.R. 1.2, 2.2, and 2.3(B) and Prof.Cond.R. 8.4(d). In his arguments to the board, Hoover maintained that he did not order Murray to serve time for the purpose of satisfying her fine, asserting that R.C. 2947.14 did not apply. He contended that he took into consideration Murray's ability to pay her outstanding fines and costs when setting her bond on the new charges that came before him.

{¶ 161} The board agreed with disciplinary counsel that Hoover had committed the four violations. The board noted that Murray was the only one of the 16 defendants included in relator's complaint who had the benefit of counsel. And the record shows that even if Hoover did not have her incarcerated for failing to pay her overdue fines, he conditioned his granting Murray a recognizance bond on her ability to pay her outstanding fines and costs—not on the application of former Crim.R. 46, *see* 157 Ohio St.3d CXXIX.[4] While Hoover maintains that he could have considered Murray's record of appearance in determining her bond, *see*

4. Former Crim.R. 46 was repealed effective July 1, 2023, and replaced by the General Assembly with R.C. 2937.011. *See* 2023 H.B. No. 191; *Ohio Legislative Service Commission, Final Analysis, H.B. No. 191*, at 2-3, available at https://www.legislature.ohio.gov /download?key=21315&format=pdf (accessed Aug. 1, 2024).

former Crim.R. 46(C)(4), it is apparent from the transcript of Murray's arraignment that her record of appearance was not a consideration. We agree with the board that Hoover failed to follow former Crim.R. 46 in setting bail and instead decided to condition bond solely on Murray's ability to pay her outstanding fines and costs.

{¶ 162} The purpose of bond is to ensure that a person appears for the next hearing, not to coerce that person to pay previous fines and court costs. In the May 2021 bench card submitted as a joint exhibit by the parties, we expressly stated that setting bond based on the amount of fines, costs, and other fees owed was a "Non-Permitted Method" of collecting those fines and costs. This type of coercive conduct does not promote the public's confidence in the judiciary and is prejudicial to the administration of justice.

{¶ 163} Further, this conduct indicates that Hoover approached Murray's case with a socioeconomic bias. During the hearing, Hoover's focus was entirely on Murray's failure to pay her fines and costs associated with a previous drug conviction. Even after Murray informed Hoover that she was unemployed and her public defender took over to explain the various reasons why Murray should receive a low bond, Hoover's view on setting Murray's bond did not change until Murray confirmed that she could pay off the fines and costs from her previous case. To Hoover, that was "a big difference." Even still, Hoover, told Murray that he would not consider a signature bond, also known as an own-recognizance bond, until he knew the fines and costs from the previous case were paid. This type of rhetoric indicates to the public that those who have the ability to pay fines and costs have a better opportunity to have a reduced bond in Hoover's courtroom than someone who does not have the means to pay. While Hoover may have believed that only those who pay their fines and costs are demonstrating responsibility, such an attitude demonstrates a bias against those who are socioeconomically disadvantaged.

{¶ 164} Therefore, we adopt the board's findings and conclusions that Hoover violated Jud.Cond.R. 1.2, 2.2, and 2.3(B) and Prof.Cond.R. 8.4(d) in this matter.

### O. Count 15: the Somma Matter

{¶ 165} In February 2022, Logan Somma was charged with possession of marijuana, a nonjailable minor-misdemeanor offense, with a possible fine of up to $150. Somma appeared without counsel for his arraignment before Hoover and pleaded guilty.

{¶ 166} Somma and Hoover engaged in a discussion of Somma's criminal record and talked about several warrants for his arrest. Hoover told Somma, "Here's your problem: because you've shown yourself to not obey court orders, and you have an extensive record, I fine you $150. . . . But here's the part you're not going to like. I don't trust you to pay this. Therefore, they're going to figure out what you owe. You're either going to pay it, or you're going to stay." Somma explained, "I don't have any money right now," and Hoover responded, "You're going to stay. What happens is, you've done this over and over and over again. The reason you've got warrant blocks, it looks like ten of them, is because you never do what you're supposed to do."

{¶ 167} Somma told the court that he was supposed to meet with probation that same day regarding a different case, a fact he had told Hoover earlier in their discussion, but Hoover retorted, "Boy, aren't they going to be ticked when they find out you can't come because you've got new drug convictions? Looks to me like you're almost looking to go back to prison. . . . But you obviously are not learning the lessons."

{¶ 168} Somma told Hoover that he would pay the fine, but Hoover continued to reprimand Somma: "Drugs. Theft. Violence. . . . You don't do what you're supposed to do. That's what the problem is. Do you think I want to just get in line with a warrant myself? Your drug problems are obviously very bad."

Somma explained that he was in court that day trying to take care of the matter. But Hoover said, "Yep. With all your problems, you're still bouncing weed in your pocket, huh?" Somma told the court that he did not have marijuana on him and that he did not have any money with him.

{¶ 169} Hoover then asked Somma whether there was anyone he could call "or are we just wasting our time?" Somma said that he could call his wife to make a payment over the phone, and Hoover responded by directing him to wait in the courtroom while the court determined exactly how much Somma owed. That day, Somma's wife paid the $150 fine and $140 in court costs, and Somma was released.

{¶ 170} Disciplinary counsel charged Hoover with violations of Jud.Cond.R. 1.2, 2.2, and 2.3(B) and Prof.Cond.R. 8.4(d), and the board determined that he had violated each rule. Hoover objects to the violations found by the board, emphasizing the fact that he did not jail Somma following the hearing.

{¶ 171} Hoover threatened to incarcerate Somma on a nonjailable offense, telling Somma that he was either going to pay the $150 fine that was imposed that day or spend time in jail. Somma was then held in custody at the courthouse until his wife paid the fines and costs that same day. Hoover did not conduct an ability-to-pay hearing, did not advise Somma of his due process-rights, and did not segregate his fine from the costs. Furthermore, Hoover demeaned Somma with his comment alleging that Somma had brought drugs into the courtroom. Hoover's statement asking Somma if there was anyone he could call to pay his fine and costs in order to avoid going to jail does not reflect a push for responsibility; rather, it amounts to the extortion of a person who is without funds needed to immediately pay a fine and costs. Therefore, we agree with the board and conclude that Hoover violated Jud.Cond.R. 1.2, 2.2, and 2.3(B) and Prof.Cond.R. 8.4(d).

### P. Count 16: the Pruitt Matter

{¶ 172} In January 2018, Lanee Pruitt pleaded no contest to one count of OVI, a first-degree misdemeanor, and she was found guilty. Pruitt was ordered to

serve 5 days in jail, 30 days of home incarceration, and 6 months of community control and comply with treatment recommendations and ignition-interlock/alcohol monitoring. She was also ordered to pay $3,312 in fines and court costs.

{¶ 173} Several months later, Pruitt entered into a payment plan in which she agreed to pay $100 every two weeks toward her fines and court costs. Nothing in the plan required Pruitt to return to court. However, Pruitt did not pay according to the payment plan, and she was sent past-due notices informing her that the entire balance was due.

{¶ 174} In September 2018, a magistrate improperly issued a warrant for Pruitt's arrest based solely on her failure to pay her fine and court costs. No hearing was scheduled, and Pruitt had not received any notice requiring her appearance.

{¶ 175} More than three years later, in February 2022, Pruitt was arrested on the outstanding warrant during a traffic stop during which she was a passenger in the vehicle. Pruitt appeared before Hoover later that day. At that time, Pruitt had paid $1,511.80 toward her fine and costs and had completed all other terms of her sentence.

{¶ 176} Hoover addressed Pruitt and informed her that she had not paid her fine and costs and that she had not come back to court. Pruitt explained that she did not know that she had to come back to court and admitted that she had not paid all of her fine and costs, but she noted that the government had seized her tax refund. Hoover responded, "Tell me something good. Tell me you showed up today and you got $2,469 with you." Pruitt informed Hoover that she did not have the money to pay the fine but that she believed she would have it soon because it was income-tax season.

{¶ 177} Hoover, after noting that Pruitt had not paid her fine and costs from four years prior, asked, "Why shouldn't I just keep you in jail?" Pruitt said she could make payments, but Hoover retorted, "You didn't, for four years. . . . [Y]ou just walked away. Why should I trust you now?" Pruitt told Hoover that she had

a job and an infant. Hoover then asked, "What can you come up with today?" When Pruitt responded that she had $200, Hoover said, "Nah." Hoover told Pruitt, "I don't think I'm gonna let you go when you've taken a four year vacation from it. See ya."

{¶ 178} Hoover ordered Pruitt to be held in custody until she paid $250 and ordered her to return to court in two weeks. Hoover failed to credit Pruitt with $50 toward her fine for the time she had been held in custody. Pruitt paid $250 an hour later, and she was released.

{¶ 179} Pruitt returned to court as required, and she brought proof that the attorney general had seized her tax refund, which was credited toward her outstanding fine and costs. Hoover then ordered Pruitt to return to court two months later for "further orders."

{¶ 180} Pruitt paid another $200 toward her court costs and again appeared in court as ordered, at which point Hoover issued another order directing Pruitt to appear the following month for "further orders."

{¶ 181} Disciplinary counsel charged Hoover with violations of Jud.Cond.R. 1.2, 2.2, and 2.3(B) and Prof.Cond.R. 8.4(d). Hoover disputed these violations, claiming that he never intended for Pruitt to serve any jail time. During his disciplinary hearing, Hoover recognized that the warrant for Pruitt was issued in error, but he justified holding her in custody until she paid on the basis that she was already in court and should not have been permitted to leave until she made arrangements to pay her overdue fine and costs.

{¶ 182} The board found that Hoover committed all four violations. It determined that Hoover "extorted money from Pruitt, who was wrongfully arrested and then held in custody under threat of continued custody until she paid $250" toward her fine and costs. The board concluded that Hoover failed to segregate Pruitt's fine from the costs, violated her due-process rights, and did not credit Pruitt

$50 for the time she spent in custody. Additionally, the board found that Hoover demonstrated a bias toward Pruitt based on her socioeconomic status.

{¶ 183} We find that the board's findings and conclusions are supported by the record. Therefore, we conclude that Hoover violated Jud.Cond.R. 1.2, 2.2, and 2.3(B) and Prof.Cond.R. 8.4(d).

## IV. SANCTION

{¶ 184} Having found that Hoover committed 64 violations and having overruled his objection as it relates to the board's findings of misconduct, we now consider the appropriate sanction. The board recommends that Hoover be suspended from the practice of law for two years and that he pay the costs of these proceedings. Hoover objects to the board's recommended sanction because, he maintains, the board did not adequately consider that (1) he gave defendants an initial opportunity to enter into payment plans, (2) his imposed sentences are light in comparison to what the law allowed him to impose, and (3) he made a practice of giving defendants additional opportunities to be responsible, provided that the defendant showed some interest in being responsible. Hoover also asserts that the board did not adequately consider his "judicial philosophy" that to get people on the right track, they must face consequences for their actions. Hoover argues that a one-year suspension from the practice of law with six months stayed is appropriate.

{¶ 185} "The primary purposes of judicial discipline are to protect the public, guarantee the evenhanded administration of justice, and maintain and enhance public confidence in the integrity of the judiciary." *Disciplinary Counsel v. Bachman*, 2020-Ohio-6732, ¶ 22, citing *O'Neill*, 2004-Ohio-4704, at ¶ 33. "[S]anctions also serve as a deterrent to similar violations by judges, lawyers, and judicial candidates in the future." *Disciplinary Counsel v. Horton*, 2019-Ohio-4139, ¶ 60. In determining the appropriate sanction for judicial misconduct, "we consider all relevant factors, including the ethical duties that the judge violated, the

aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases." *Disciplinary Counsel v. Berry*, 2021-Ohio-3864, ¶ 14.

## A. Hoover committed the same four violations against each of the 16 defendants

{¶ 186} Hoover committed the same four violations, Jud.Cond.R. 1.2, 2.2, and 2.3(B) and Prof.Cond.R. 8.4(d), in all 16 criminal cases at issue here. Each violation stemmed from Hoover's methods of collecting fines and costs from the defendants in those cases, most of whom were poor and without counsel.

{¶ 187} Hoover found that applying R.C. 2947.14 and holding ability-to-pay hearings was impractical. He thought that his actions, namely, threatening defendants with incarceration to compel them to pay fines and costs, ensured that those defendants learned "basic discipline" and "basic responsibility." But these tactics also helped ensure that the Stow Municipal Court was self-funded. And Hoover believed that it was his "responsibility to see that [he did] not burden the innocent taxpayers by our lack of collecting what's been sentenced to a Defendant."

{¶ 188} A judge must comply with the overriding purposes and principles of sentencing, to punish the offender and protect the public. *See* R.C. 2929.21. This may include sentencing a defendant to pay a fine in lieu of incarceration, but it must be done within the confines of the law to ensure that each defendant receives due process. Hoover did not act to guarantee defendants their due-process rights to safeguard against their being wrongfully incarcerated for failing to pay fines *and* costs.

{¶ 189} As stated above, the General Assembly has expressly prohibited courts from imprisoning offenders in satisfaction of a fine except as provided by R.C. 2947.14. R.C. 2947.14(D). And a court cannot order that a defendant be sent to jail for failing to pay court costs, because costs are civil in nature and, constitutionally, a person cannot be imprisoned for failure to pay a civil debt. *See Taylor*, 2020-Ohio-3514 at ¶ 21; Ohio Const., art. I, § 15. To protect individuals

from improper imprisonment for failure to pay fines or costs, judges must observe the safeguards provided by statute, such as (1) segregating fines from costs and other financial sanctions, (2) providing the defendant reasonable notice of a hearing, (3) conducting an ability-to-pay hearing, (4) advising the defendant of the right to counsel, (5) providing the defendant with the opportunity to be heard, and (6) making a specific finding that the defendant has the ability to pay the fine and willfully refuses to do so. Those safeguards have been published by this court and made readily available to judges since 2014, as reflected in the February 2014 and May 2021 bench cards submitted as joint exhibits by the parties.

{¶ 190} "[A]t its core, procedural due process under both the Ohio and United States Constitutions requires, at a minimum, an opportunity to be heard when the state seeks to infringe a protected liberty or property right." *State v. Cowan*, 2004-Ohio-4777, ¶ 8, citing *Boddie v. Connecticut*, 401 U.S. 371, 377 (1971). And the procedures that are in place protect the rights of the citizens, especially those who are socioeconomically disadvantaged, by preventing a judge from improperly sending individuals to jail for failing to pay fines and costs.

{¶ 191} As a result of Hoover's actions, 2 defendants, Douglas Dawson and Matthew Cannon, were wrongfully incarcerated, and 14 defendants were coerced into paying fines *and* costs under unlawful threats of incarceration. Hoover's overzealous collection of unsegregated fines and costs manifested a bias against those of lower socioeconomic status, a bias that, as detailed above, was readily apparent during his interactions with these defendants. Moreover, by disregarding statutorily required procedures to achieve his goals of teaching defendants "basic discipline" and "basic responsibility," Hoover acted in a manner that diminished the public's confidence in the judiciary and was prejudicial to the administration of justice.

**B. Stipulated aggravating and mitigating factors**

{¶ 192} As for aggravating factors, the parties stipulated that Hoover engaged in a pattern of misconduct, committed multiple offenses, and harmed vulnerable individuals. *See* Gov.Bar R. V(13)(B)(3), (4), and (8). The board determined that Hoover "fail[ed] to comprehend the significant impact that his conduct . . . had on both the victims and their families"—people who were struggling financially, battling addiction and mental illness, and grieving the loss of family members. The board recognized the "repeated and obvious disparate treatment of the socioeconomically disadvantaged."

{¶ 193} Additionally, the board determined that Hoover expressed no sympathy toward the defendants during their respective cases before him or during his disciplinary hearing. When Hoover was questioned about testimony that Lanee Pruitt gave as a witness during his disciplinary hearing, Hoover characterized it as "theatrical." Hoover also treated the matter concerning Darcell Smitherman with sarcasm, quipping that "[w]e'd have to create the Darcell Smitherman Municipal Court" to provide Smitherman with proper notice regarding probation violations.

{¶ 194} While the parties stipulated that Hoover had cooperated during the disciplinary proceedings, *see* Gov.Bar R. V(13)(C)(4), the board found that Hoover was "not entirely forthcoming during the hearing." It noted that Hoover was, at times, "combative" with disciplinary counsel and had "shifted blame to others." For instance, he attempted to justify his mistake in wrongfully incarcerating Dawson by pointing out that he was handling another judge's docket. In the Cannon matter, Hoover blamed his staff for altering the court order. Therefore, the board recognized that Hoover was generally cooperative but did not fully acknowledge the wrongful nature of his conduct.

{¶ 195} Perhaps more troubling is the board's observation that Hoover attempted to justify his failure to provide due-process protections to the defendants by pointing to their criminal histories. When he was asked at his disciplinary

hearing if he believed that Dawson should have spent any time in jail for his nonjailable offense, Hoover responded, "If you saw Dawson's record, you'd think any time he spent in jail was a good thing for the world."

{¶ 196} Hoover's lack of concern for his behavior is also problematic. The board noted that even after he was sent a letter of inquiry on the matter and following disciplinary counsel's initial complaint in December 2021, Hoover continued to engage in the same coercive tactics when collecting fines and costs from defendants. Hoover admitted that he did not follow R.C. 2947.14 because he found it impractical. Hoover's decision to disregard the Ohio Constitution, statutes enacted by the General Assembly, and this court's thorough guidance in favor of his own preferences is unjustifiable. *See* Jud.Cond.R. 2.2, Comment 2 ("a judge must interpret and apply the law without regard to whether the judge approves or disapproves of the law in question").

{¶ 197} Additionally, it was not until his disciplinary hearing that Hoover recognized that his informal and casual manner of interacting with defendants could be considered problematic: "I've learned that you've got to watch your words. . . . I use words like knucklehead, other slang like that. And I'm going to be more careful. . . . I can't be as informal as I have been."

{¶ 198} As for mitigating factors, the board found that Hoover does not have a disciplinary record, did not act with a dishonest or selfish motive, cooperated with disciplinary counsel, and submitted substantial evidence of good character. *See* Gov.Bar R. V(13)(C)(1), (2), (4), and (5). Moreover, the board noted that Hoover had an "unblemished career of nearly 40 years as a lawyer and judge." He has been actively involved in the community and created programs to educate and rehabilitate defendants. Hoover also made changes to the municipal court's budget, cutting various expenses and increasing the collection of debts.

{¶ 199} The board recognized that Hoover has done great things for the Stow Municipal Court, many defendants, and the community, but nonetheless, his

good intentions and actions do not excuse his failure to comply with the Code of Judicial Conduct and the Rules of Professional Conduct. *See Disciplinary Counsel v. Lemons,* 2022-Ohio-3625, ¶ 24. It found that Hoover's casual attitude toward defendants and improper application of the law led to violations of defendants' liberties and hindered the administration of justice.

### C. An 18-month suspension from the practice of law with 6 months stayed is warranted

{¶ 200} The board considered various cases in which we imposed sanctions ranging from a six-month suspension to an indefinite suspension against judges who committed misconduct similar to Hoover's actions here. The board found that Hoover's case falls somewhere between the misconduct in *Disciplinary Counsel v. Medley*, 2004-Ohio-6402, ¶ 43, in which this court imposed an 18-month suspension with six months stayed, and *Carr*, 2022-Ohio-3633, at ¶ 98, in which we imposed an indefinite suspension. It has recommended that we suspend Hoover for two years. During oral argument, Hoover's counsel agreed that *Medley* and *Carr* are on point, but he asserted that Hoover's conduct was not as severe as the judicial misconduct in either of those cases. Hoover maintains that a one-year suspension, with six months stayed, is the appropriate sanction.

{¶ 201} Hoover's misconduct caused harm in the form of the unlawful incarceration of two defendants, and such "abuse of the public trust warrants an actual suspension from the practice of law," *Bachman*, 2020-Ohio-6732, at ¶ 21. In order to determine the proper length of the suspension, we look to other cases involving similar conduct.

{¶ 202} In *Bachman*, we ordered a magistrate to serve a six-month suspension from the practice of law for unlawfully holding a woman in custody for two days for contempt of court after she created a brief disturbance outside of his courtroom. *Id.* at ¶ 5-11, 37. We determined that Bachman had violated Jud.Cond.R. 1.2, 2.2, and 2.8(B) (requiring a judge to be "patient, dignified, and

courteous to litigants, jurors, witnesses, lawyers, court staff, court officials, and others with whom the judge deals in an official capacity"). *Bachman* at ¶ 12. Bachman did not have a prior disciplinary record, did not act with a selfish or dishonest motive, exhibited a cooperative attitude toward the disciplinary proceedings, presented evidence of good character and reputation, and had other sanctions, like the loss of his employment, imposed for his misconduct. *Id.* at ¶ 14. We recognized that even though Bachman had engaged in only a single, isolated instance of misconduct, his actions were more egregious than the misconduct in several judicial-officer cases in which this court had ordered a public reprimand or fully stayed suspension; thus, an actual suspension from the practice of law was warranted. *Id.* at ¶ 17, 21.

{¶ 203} In *Disciplinary Counsel v. Repp*, 2021-Ohio-3923, we ordered a judge to serve a one-year suspension from the practice of law after he violated Jud.Cond.R. 1.2, 2.2, and 2.8(B) and Prof.Cond.R. 8.4(d) by ordering a spectator in his courtroom to submit to a drug test and then sentencing her to ten days in jail for contempt of court after she refused to be tested. *Repp* at ¶ 2-14, 30. As for aggravating factors, Repp had committed multiple offenses, caused harm to vulnerable victims, and acted with a selfish or dishonest motive. *Id.* at ¶ 23. In mitigation, Repp had a clean disciplinary record, and he made a full and free disclosure to the board and exhibited a cooperative attitude toward the disciplinary proceedings. *Id.* at ¶ 24. Repp also had numerous letters attesting to his good character and reputation. *Id.* While Repp's case was similar to *Bachman*, we acknowledged that Repp's improper demeanor had been directed at two victims— the spectator and her defendant-boyfriend—and that one of those victims suffered "great personal indignities and emotional distress" due to her wrongful incarceration. *Id.* at ¶ 25, 30. We agreed with the board that Repp's conduct was far more egregious than that in *Bachman* and determined that a one-year suspension from the practice of law was warranted. *Id.* at ¶ 32.

**{¶ 204}** Most recently, in *Gaul*, 2023-Ohio-4751, we ordered a judge to serve a one-year suspension from the practice of law after finding that he had violated multiple rules, including Jud.Cond.R. 1.2, 2.2, and 2.3(B) and Prof.Cond.R. 8.4(d), for a litany of misconduct that included coercing a defendant into a plea deal crafted solely by the judge, improperly questioning a defendant during a criminal trial, making demeaning and racially biased comments to a defendant during sentencing, making demeaning comments toward a party in a civil action, using his position in an attempt to have a defendant's federal conviction overturned, making a legal error resulting in a man's prolonged incarceration, quarreling with a criminal defendant during the defendant's arraignment, and coercing another defendant into a plea deal. *Gaul* at ¶ 13-68. Gaul had received prior discipline, refused to acknowledge the wrongfulness of his conduct, and acted with a dishonest or selfish motive. *Id.* at ¶ 71. Gaul also engaged in a pattern of misconduct, committed multiple offenses, and caused harm to multiple vulnerable victims. *Id.*

**{¶ 205}** We compared Gaul's misconduct to the judge's misconduct in *Disciplinary Counsel v. Parker*, 2007-Ohio-5635, a case in which this court imposed an 18-month suspension from the practice of law, with six months conditionally stayed, against a judge who had committed 31 rule violations by abusing his contempt power, failing to act impartially, attempting to coerce plea agreements in two criminal cases, and routinely mistreating criminal defendants and others, *id.* at ¶ 6-55, 130. We found that Gaul's misconduct was at least as egregious as Parker's, given that he had coerced plea deals in more serious felony offenses and had prior discipline, but we nevertheless accepted the board's recommended sanction and imposed a one-year suspension from the practice of law on Gaul. *Gaul* at ¶ 108-109, 117.

**{¶ 206}** In *Medley*, 2004-Ohio-6402, we suspended a judge from the practice of law for 18 months, with six months stayed, after the judge violated rules

requiring judges to promote the integrity and independence of the judiciary by accepting a defendant's guilty plea to three criminal charges in exchange for the dismissal of a fourth charge without any counsel present. *Id.* at ¶ 7-13, 43. Medley also showed actual bias in favor of a local political party by repeatedly issuing ex parte orders to prevent a creditor from collecting on a default judgment against an official, and in other cases, he facilitated collections by granting default judgments against debtors who failed to answer complaints and then issuing warrants for the debtors' arrests if they did not pay or appear within 30 days. *Id.* at ¶ 14-30. Medley's unlawful collection procedure increased judgment collections in his court from $90,000 in 1993 to $800,000 in 2003. *Id.* at ¶ 31.

{¶ 207} Medley justified this procedure by claiming that it was consistent with the law and helped the judgment creditors of Gallia County ensure collection of debts owed to them by the judgment debtors. *Id.* at ¶ 34-35. While the procedure was effective, it was wholly unlawful: the procedure "circumvented the protections afforded by law to . . . judgment debtors by making freedom from incarceration dependent upon payment in full of a small-claims judgment." *Id.* at ¶ 36. We found that Medley had failed to preserve the integrity and independence of the judiciary and prejudiced the administration of justice. *Id.* at ¶ 37.

{¶ 208} In determining the appropriate sanction, we recognized that Medley had engaged in a pattern of misconduct. *Id.* at ¶ 38. Medley had also previously been disciplined and had refused to acknowledge the wrongfulness of his actions. *Id.* However, Medley had not acted with a selfish motive, had a reputation for good character, and cooperated fully in the disciplinary proceedings. *Id.* We began with the starting point of a six-month suspension from the practice of law based on Medley's ex parte communications and previous discipline. *Id.* at ¶ 41. Noting that Medley had decided the merits of legal issues in criminal and civil cases in derogation of procedural rules, that sanction increased to an 18-month suspension from the practice of law with six months stayed. *Id.* at ¶ 42-43. We explained that

"[a] judge may not blatantly disregard procedural rules simply to accomplish what he or she may unilaterally consider to be a speedier or more efficient administration of justice." *Id*. at ¶ 42.

{¶ 209} In *Carr*, 2022-Ohio-3633, we ordered that a judge be indefinitely suspended from the practice of law for violating several rules of the Code of Judicial Conduct and Rules of Professional Conduct, including Jud.Cond.R. 1.2 and 2.2 and Prof.Cond.R. 8.4(d), after she created what amounted to a "modern-day debtors' prison" by using capias warrants and incarceration as a means to compel the payment of fines and costs by tying bond amounts to the amount of the fines and costs. *Id.* at ¶ 31-32. Carr's misconduct was readily distinguishable from the misconduct in *Medley* because, while both Medley and Carr had improperly used arrest warrants and bonds to compel the collection of judgments or fines, Medley had not concealed those actions with false journal entries as Carr had done in her cases. *Carr* at ¶ 89.

{¶ 210} We also recognized that "the deprivation of numerous defendants' liberty occasioned by Carr's misconduct vastly exceed[ed] the one- or two-day jail stays occasioned by the misconduct of Bachman and Repp." *Id.* at ¶ 95. At least five of Carr's victims had spent time in jail as a result of her improper use of capias warrants. *Id.* "Carr created a risk that dozens of people would be wrongfully arrested and jailed if they were unable to pay their fines." *Id*. Therefore, we determined that Carr's misconduct warranted a sanction far greater than a six-month or one-year suspension. *Id.*

{¶ 211} In determining the appropriate length of Carr's sanction, we acknowledged that Carr had also engaged in other misconduct—namely, she had issued additional improper capias warrants and made false statements, engaged in ex parte communications and improper plea bargaining, exhibited a lack of decorum and dignity in judicial office, and abused the contempt power and failed to recuse herself from proceedings in which she had a conflict. *Id.* at ¶ 14-16, 25-

26, 42-43, 62. The board would have recommended an indefinite suspension but for Carr's cooperation during the disciplinary proceedings and her commitment to mental-health treatment. *Id.* at ¶ 96. However, we rejected Carr's mental disorders as a mitigating factor based on insufficient evidence regarding their contribution to her misconduct. And we also found that Carr's evidence of good character and reputation was "procured with a false narrative." *Id.* Thus, we found that an indefinite suspension was appropriate. *Id.* at ¶ 98.

{¶ 212} In this case, an actual suspension from the practice of law is required, because Hoover wrongfully incarcerated at least two individuals. *See Bachman*, 2020-Ohio-6732, at ¶ 21, 36-37 (six-month suspension for wrongful incarceration of *one* individual). A term suspension of more than six months is a consequence that will protect the public from future misconduct, because it will require Hoover to end his position in office and therefore prevent him from continuing to use threats of incarceration to intimidate defendants into paying their fines and costs. *See Disciplinary Counsel v. Burge*, 2019-Ohio-3205, ¶ 32; Gov.Jud.R. III(1)(B)(4).

{¶ 213} However, a one-year suspension, like in *Repp*, is also insufficient in this case. *See Repp*, 2021-Ohio-3923, at ¶ 30. Hoover's misconduct was more serious than that in *Bachman* and *Repp*, as he caused two people to be wrongfully incarcerated for more than one- or two-day jail stays: Dawson spent seven days in jail, and Cannon spent four days in jail. Hoover's misconduct is more similar to the misconduct in *Medley* and *Carr*, as he used incarceration and threats of incarceration as a means of collecting fines and costs from numerous defendants. Hoover, like Carr and Medley, created a risk that numerous people would be wrongfully incarcerated. Thus, a six-month or one-year suspension from the practice of law is not sufficient under these circumstances. *See Carr*, 2022-Ohio-3633, at ¶ 96 (indefinite suspension); *Medley*, 2004-Ohio-6402, at ¶ 43 (18-month suspension with 6 months stayed).

{¶ 214} Hoover argues that his misconduct was less egregious than the misconduct in *Medley* and *Carr*, whereas the board finds his misconduct is more egregious than *Medley* but less egregious than *Carr*. While Medley, Carr, and Hoover each created an environment where criminal or civil defendants were wrongfully held in order to coerce payments, Medley and Carr engaged in other improper conduct, like coercing plea agreements. *See Carr* at ¶ 14-16, 25-26, 42-43; *Medley* at ¶ 7-37. Additionally, Hoover also did not engage in acts of dishonesty like Carr. *See Carr* at ¶ 18. Therefore, we agree with the board that an indefinite suspension is not appropriate here.

{¶ 215} Hoover did, however, act with bias toward socioeconomically disadvantaged people and failed to act in a manner that guaranteed them due process under the law. Hoover ordered most of the defendants who were included in disciplinary counsel's complaint to be held in custody under the threat of being transferred to jail if they did not pay their fines and costs. Hoover leaned into the idea of a debtors' prison, unlawfully incarcerating or threating to incarcerate individuals for nonpayment of fines without due process, and unconstitutionally incarcerating or threatening to incarcerate individuals for nonpayment of court costs. And he routinely failed to inform the defendants of their right to counsel.

{¶ 216} Hoover has an unblemished career, and he has helped improve the Stow Municipal Court and created programs to help first-time offenders stay out of jail. And like Medley, Hoover was operating to ensure that justice was done; Medley wanted plaintiffs to receive their judgments owed by judgment debtors and Hoover wanted to ensure that defendants were adequately punished and that innocent taxpayers were not burdened by defendants failing to pay their fines and costs. But Hoover, like Medley, acted outside the confines of the law, specifically R.C. 2947.14 and Article I, Section 15 of the Ohio Constitution, and he harmed vulnerable people. In addition to harming the defendants, Hoover purposely involved the families of the defendants—innocent people—to extort money from

them. The families of the defendants were not the wrongdoers, and Hoover's endeavor to squeeze money from them so that they might keep their loved ones out of jail was reprehensible.

{¶ 217} We keep in mind that the focus of our judicial-discipline system is to "protect the public, guarantee the evenhanded administration of justice, and maintain and enhance public confidence" in the judiciary. *O'Neill*, 2004-Ohio-4704, at ¶ 33. In Ohio, "[w]e hold judges to the highest standards of professional behavior because they are invested with the public trust." *Carr*, 2022-Ohio-3633, at ¶ 86, citing *O'Neill* at ¶ 57. As noted above, a judge "may not blatantly disregard procedural rules simply to accomplish what he or she may unilaterally consider to be a speedier or more efficient administration of justice." *Medley*, 2004-Ohio-6402, at ¶ 42. We find that Hoover's misconduct, especially his unlawful and coercive methods of collecting fines and costs from defendants, as well as the aggravating and mitigating factors present here are similar enough to the misconduct and aggravating and mitigating factors in *Medley* to warrant an 18-month suspension from the practice of law, with six months stayed on the condition that Hoover commit no further misconduct.

## V. CONCLUSION

{¶ 218} Accordingly, Kim Richard Hoover is suspended from the practice of law in Ohio for 18 months with six months stayed on the condition that he commit no further misconduct. If Hoover fails to comply with the condition of the stay, the stay will be lifted and he will serve the entire 18-month suspension. Pursuant to Gov.Jud.R. III(7)(A), Hoover is immediately suspended from judicial office without pay for the duration of his disciplinary suspension. Costs are taxed to Hoover.

Judgment accordingly.

_____

Joseph M. Caligiuri, Disciplinary Counsel, and Kelli C. Schmidt, Assistant Disciplinary Counsel, for relator.

Montgomery Jonson L.L.P., George Jonson, and Lisa Zaring for respondent.

_____